JS 44C/SDNY
REV. 4/2012

**CIVIL COVER SHEET**

12 CIV 4568

JUDGE FORREST

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Michael Waber | KENNETH D. LEWIS, JOE L. PRICE, JONATHAN A. THAIN, NEIL A. COTTY, WILLIAM BARNET, III, MUKESH D. AMBANI, SUSAN S. BIES, WILLIAM P. BOARDMAN, FRANK P. BRAMBLE, SR., VIRGIS W. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| marc henzel, law offices of marc s henzel<br>431 montgomery ave, merion PA 19066<br>610-660-8000, F610-660-8080 Mhenzel@henzellaw.com | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Derivative for the benefit of nominal def. Bank of America Corp. for breaches of fiduciary duties & unjust enrichment

Has this or a similar case been previously filed in SDNY at any time? No ☒ Yes ☐   Judge Previously Assigned

If yes, was this case  Vol. ☐ Invol. ☐ Dismissed. No ☐ Yes ☐   If yes, give date _____   & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?   No ☒   Yes ☐

RECEIVED
JUN 11 2012
U.S.D.C. S.D. N.Y.
CASHIERS

*(PLACE AN [x] IN ONE BOX ONLY)*   NATURE OF SUIT

**TORTS**

ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | [ ] 630 LIQUOR LAWS | **PROPERTY RIGHTS** | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | **PERSONAL PROPERTY** | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | [ ] 460 DEPORTATION |
| | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 MEDICARE ACT | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | [ ] 840 TRADEMARK | |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 690 OTHER | **SOCIAL SECURITY** | [ ] 480 CONSUMER CREDIT |
| | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | | [ ] 861 HIA (1395ff) | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | | | **LABOR** | [ ] 862 BLACK LUNG (923) | [ ] 810 SELECTIVE SERVICE |
| [x] 160 STOCKHOLDERS SUITS | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 864 SSID TITLE XVI | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | **PRISONER PETITIONS** | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | **ACTIONS UNDER STATUTES** | [ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255 | [ ] 740 RAILWAY LABOR ACT | **FEDERAL TAX SUITS** | [ ] 891 AGRICULTURAL ACTS |
| | **CIVIL RIGHTS** | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 892 ECONOMIC STABILIZATION ACT |
| | [ ] 441 VOTING | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 893 ENVIRONMENTAL MATTERS |
| | [ ] 442 EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | | | [ ] 894 ENERGY ALLOCATION ACT |
| **REAL PROPERTY** | [ ] 443 HOUSING/ ACCOMMODATIONS | | **IMMIGRATION** | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 444 WELFARE | **PRISONER CIVIL RIGHTS** | [ ] 462 NATURALIZATION APPLICATION | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS- ALIEN DETAINEE | | |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 TORTS TO LAND | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | | | | |
| [ ] 245 TORT PRODUCT LIABILITY | | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

_Check if demanded in complaint:_

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $_____   OTHER _____   JUDGE _____   DOCKET NUMBER_____

_Check YES only if demanded in complaint_
JURY DEMAND: ☒ YES ☐ NO   NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

**(PLACE AN x IN ONE BOX ONLY)**       **ORIGIN**

[x] 1 Original Proceeding    2 Removed from State Court    3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation    [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] a. all parties represented

[ ] b. At least one party is pro se.

---

**(PLACE AN x IN ONE BOX ONLY)**      **BASIS OF JURISDICTION**      *IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441)*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [x] 4 DIVERSITY

---

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | 1 | 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | 5 | 5 |
| CITIZEN OF ANOTHER STATE | x 2 | x 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | 4 | 4 | FOREIGN NATION | 6 | 6 |

---

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Michael Waber
501 Fairview Road
Penn Valley, PA 19072
Montgomery County

---

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

100 N. Tyron Street, Charlotte, North Carolina 28255 Mecklenburg County
Nominal Defendant Bank of America is a Delaware corporation, with its headquarters located at 100 N. Tyron Street, Charlotte, North Carolina 28255  Mecklenburg County

---

DEFENDANT(S) ADDRESS UNKNOWN
     REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

---

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 5/31/12    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
RECEIPT #    NO
X YES (DATE ADMITTED Mo. 12 Yr. 1997 )
Attorney Bar Code # MSH 9223

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

JUDGE FORREST
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL WABER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. **12 CIV 4568** |
| v. | ) |
| | ) |
| KENNETH D. LEWIS, JOE L. PRICE, | ) |
| JONATHAN A. THAIN, NEIL A. COTTY, | ) ECF CASE |
| WILLIAM BARNET, III, MUKESH D. | ) |
| AMBANI, SUSAN S. BIES, WILLIAM P. | ) |
| BOARDMAN, FRANK P. BRAMBLE, SR., | ) |
| VIRGIS W. COLBERT, JOHN T. | ) |
| COLLINS, GARY L. COUNTRYMAN, | ) |
| CHARLES K. GIFFORD, CHARLES O. | ) |
| HOLLIDAY JR., D. PAUL JONES, | ) |
| MONICA C. LOZANO, WALTER E. | ) |
| MASSEY, BRIAN T. MOYNIHAN, | ) |
| THOMAS J. MAY, DONALD E. POWELL, | ) |
| CHARLES O. ROSSOTTI, and THOMAS | ) |
| M. RYAN, ROBERT W. SCULLY, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| BANK OF AMERICA CORP., | |
| | |
| Nominal Defendant. | |

JUN 1 1 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## PLAINTIFF'S VERIFIED
## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Waber, by and through his undersigned attorneys, hereby submits this

Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal

defendant Bank of America Corp. ("BoA" or the "Company") against certain current and former

members of its Board of Directors (the "Board") and executive officers seeking to remedy

defendants' breaches of fiduciary duties and unjust enrichment from January 11, 2008 to the

present (the "Relevant Period").

Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BoA, securities analysts' reports, and advisories about the Company, news articles, publicly available information regarding legal actions and investigations, and information readily available on the internet. Many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This is a shareholder derivative complaint against BoA and certain current and former executive officers of BoA.  The claims arise from material misrepresentations and omissions in the Company's proxy statements and other public declarations, regarding, among other things, BoA's acquisitions of Countrywide Financial Corporation ("Countrywide") and Merrill Lynch & Co., Inc. ("Merrill Lynch"), made during the Relevant Period.

2.     During the Relevant Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results.  Defendants failed to expose the potential for litigation resulting from Countrywide's predatory lending practices that would eventually lead to an $8.7 billion settlement.  Defendants hid the fact that Countrywide would put BoA's capital levels at risk by adding $30 billion in loan losses to the Company's balance sheet.  Defendants also hid BoA's failure to engage in proper due diligence in advance of its proposed merger with Merrill Lynch.  Defendants further concealed BoA's failure to appropriately value or conduct due diligence on Merrill Lynch's mortgage-related assets,

including its "toxic" holdings.  Subsequently, losses reported by Merrill Lynch totaled $36.3 billion in 2007 and 2008, enough to wipe out eleven (11) years of earnings previously reported by the company.

3.      As the real estate and credit markets continued to crumble in early 2008, BoA announced it had entered into a merger agreement with Countrywide that would make BoA the nation's largest mortgage lender and servicer.  Defendant Kenneth D. Lewis ("Lewis") praised the agreement as a "rare opportunity" and lauded Countrywide as the industry's "best domestic mortgage platform."   BoA would acquire Countrywide in an all stock transaction worth approximately $4 billion.

4.      Defendants repeatedly assured BoA shareholders that the Company had taken appropriate steps to reduce its exposure to subprime mortgages.  In June 2008, investors remained concerned that BoA would be required to take major write-offs due to its subprime exposure, much of which came as a result of the merger with Countrywide.

5.      On June 25, 2008, Illinois State Attorney General, Lisa Madigan, and California State Attorney General Jerry Brown, filed lawsuits against Countrywide.  The suits sought to recover damages from Countrywide for unfair and deceptive practices, violation of false advertising laws, and unfair business practices.  On July 1, 2008, Florida Attorney General Bill McCollum filed a similar lawsuit.

6.      On July 1, 2008, BoA's deal to acquire Countrywide closed, despite the fact there were numerous state investigations and lawsuits had been filed against Countrywide.

7.      On July 21, 2008, BoA announced better-than-expected second quarter 2008 results, beating analysts' estimates.  In a conference call held to discuss these results, Defendant

Joe L. Price ("Price") stated, "We think the worst is behind us on value declines, as evidenced in our results for the quarter."

8.     On August 6, 2008, Connecticut Attorney General Richard Blumenthal filed suit against Countrywide seeking restitution for homeowners who were damaged by the company's deceptive lending practices.  Later that month, West Virginia Attorney General Darrell McGraw and Indiana Attorney General Steve Carter brought similar suits against Countrywide.

9.     On September 12, 2008, with Lehman Brothers Holdings, Inc. ("Lehman"), on the verge of bankruptcy, investors became ever more concerned that Merrill Lynch would be the next company to run short of capital.  As a result, Defendant Jonathan A. Thain ("Thain"), Chief Executive Officer of Merrill Lynch, contacted executives at BoA to propose a merger between the two companies.  Over the course of the next couple of days, an agreement was put together calling for BoA to acquire Merrill Lynch in an all stock transaction valued at $50 billion (the "Merrill Acquisition").

10.    On September 15, 2008, BoA announced that it had entered into a Merger Agreement with Merrill Lynch. Investors questioned the hastiness of the deal and the transaction price, but Defendants confidently assured investors of the fairness of the price, including strong assurances to investors that BoA had conducted appropriate due diligence in determining the fairness and safety of the transaction. Defendants further represented that despite Merrill Lynch's noteworthy exposure to risky investments, the company had recently taken actions that substantially reduced its risk and the amount of toxic assets on its balance sheet.

11.    On October 6, 2008, BoA entered into a settlement agreement with the eleven state regulators who had brought suit against Countrywide.  The settlement agreement required BoA to alter mortgages on approximately 400,000 homes in an effort to make the mortgages

4

more affordable for homeowners.  The Company agreed to drop mortgage rates as low as 2.5 percent.

12.     On October 7, 2008, BoA completed a secondary offering of $10 billion worth of common stock.  Further, in October 2008, BoA received a $25 billion investment from the U.S. Government (with Merrill Lynch receiving $10 billion in funding).  BoA confidently insisted that it "did not need and did not seek" the capital injection, especially in light of its recent stock offering.

13.     Relying on Defendants' misrepresentations, shareholders of BoA overwhelmingly approved the merger with Merrill Lynch on December 5, 2008, with 82% of the vote in support.

14.     By the time of the shareholder vote, but undisclosed to the public, Merrill Lynch had suffered monstrous losses for the fourth quarter of 2008. On December 17, 2008, Defendant Lewis met with government officials and advised them that BoA would be unable to complete the deal with Merrill Lynch without considerable assistance from the government.  The government strongly encouraged BoA to continue with its acquisition of Merrill Lynch and agreed to provide additional funding and financial guarantees to protect against future potential losses.  Although this additional government funding would substantially dilute the interests of BoA's common shareholders, they were not made privy to this information prior to the December 5, 2008 vote nor were they made aware of this prior to the merger's closing.

15.     The merger closed on January 1, 2009.  In press releases and filings following the close of the transaction, BoA emphasized the success and joint potential of the newly merged companies.

16.     On January 14, 2009, investors were stunned to learn that BoA would be the recipient of another multi-billion investment from the U.S. government due to significant losses suffered by Merrill Lynch in the fourth quarter of 2008.

17.     On January 16, 2009, BoA announced a $1.8 billion loss for the fourth quarter of 2008, citing deeper trading and loan losses.  It was the Company's first reported loss in 17 years. The Company cut its dividend from $0.32 to a penny per share per quarter. In addition to its own losses, BoA reported that Merrill Lynch's preliminary results for the fourth quarter of 2008 indicated a net loss of $15.31 billion. This loss was separate from the $1.8 billion loss BoA had sustained in the quarter. BoA further confirmed that it would receive an additional $20 billion in assistance from the U.S. government and that the government had agreed to provide guarantees against further Merrill Lynch losses of $118 billion, with BoA covering the first $10 billion.

18.     Over the course of the next several days, details began to emerge concerning the truth behind BoA's deal with Merrill Lynch, including the fact that BoA had learned of Merrill Lynch's substantial fourth quarter losses prior to completing its acquisition of Merrill Lynch. Analysts believed that BoA would need to raise another $80 billion to maintain adequate capital.

19.     On January 22, 2009, Defendant Thain, former CEO of Merrill Lynch, was fired from BoA.  This action was taken after another financial scandal was disclosed at Merrill Lynch, including lavish spending of shareholder money by Defendant Thain.

20.     On January 27, 2009, New York State Attorney General Andrew Cuomo ("Cuomo") announced that a subpoena had been issued to Defendant Thain in connection with an investigation into $3.6 billion in end of the year bonuses paid by Merrill Lynch to its executives.

21.     On February 20, 2009, Cuomo announced that a subpoena had been issued to Defendant Lewis in connection to allegations that BoA had withheld pertinent information from shareholders.

22.     On February 23, 2009, it was reported by *CNNMoney.com* that a New York state judge had ordered Defendant Thain to provide further testimony about billions of dollars in bonuses handed out by Merrill Lynch on the eve of the investment bank's merger with BoA.  In a document filed with the New York state court that same day, Cuomo said Thain refused to answer questions about the "determination and amount of individual bonuses awards for all, but five employees at Merrill Lynch."  According to the documents filed by Cuomo, Thain refused to answer the questions because he was instructed not to by BoA.

23.     On February 25, 2009, it was revealed that Merrill Lynch's fourth-quarter losses were $500 million more than BoA had previously estimated, bringing the total fourth-quarter loss to $15.84 billion.

24.     The true facts, which were known by the Defendants but concealed from shareholders during the Relevant Period were as follows:

    a.  The Company was failing to sufficiently reserve for mortgage-related exposure, causing its balance sheet and financial results to be overstated;

    b.  The Company failed to engage in proper due diligence in assessing the fairness of the deals with Countrywide and Merrill Lynch;

    c.  The Company's acquisitions of Countrywide and Merrill Lynch would have catastrophic consequences on the Company's capital position and overall operations;

    d.  The acquisition of Countrywide would saddle BoA with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to $8.7 billion in losses related to litigation for predatory lending;

    e.  Merrill Lynch had not substantially decreased its risk exposure to troubled mortgage-related assets;

7

     f.     The significant and continuing deterioration of Merrill Lynch's financial position, including its substantial fourth quarter 2008 loss, was sufficient to trigger termination of the merger;

     g.    That the Company either knew it did not have a firm grasp on the aggregate amount of Merrill Lynch's losses and deteriorating positions or knew such information and withheld it from the public;

     h.    The Company had agreed to permit up to $5.8 billion in discretionary bonuses to Merrill.

     i.     The Company had to approach the U.S. government for additional funding and financial guarantees in December 2008 in order to complete its acquisition of Merrill Lynch; and

     j.     The Company's capital base was not adequate to withstand the significant deterioration in the subprime market and, as a result, BoA would be forced to seek government funding in order to raise significant amounts of additional capital.

## II.    JURISDICTION AND VENUE

25.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

26.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

27.    Venue is proper in this district because a substantial portion of transactions and wrongs complained of herein occurred in this district.

## III.    PARTIES

### A.    Plaintiff

28.    Plaintiff Michael Waber is a citizen of the Commonwealth of Pennsylvania. He is an owner and holder of BoA common stock and has continuously held BoA common stock throughout the Relevant Period.

**B.      Nominal Defendant**

29.      Nominal Defendant Bank of America is a Delaware corporation, with its headquarters located at 100 N. Tyron Street, Charlotte, North Carolina 28255.  BoA is a financial holding company, providing a range of banking and non-banking financial services and products in the United States and internationally.

**C.      Individual Defendants**

30.      Defendant Lewis is a citizen of the State of North Carolina.  He was at all relevant times, the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of BoA. Lewis solicited approval of the Merrill Acquisition through his recommendation as a member of the Company's board of directors (the "Board") appearing in the Proxy Statement for shareholders to vote in favor of the Merrill Acquisition.  Lewis signed the Agreement and Plan of Merger between BoA and Merrill dated September 15, 2008 (the "Merger Agreement"). Lewis also signed BoA's Registration Statement on Form S-4, which was filed with the SEC on October 2, 2008, as amended on October 22 and October 29, 2008 on Form S-4/A (collectively, the "Proxy Registration Statement").  The Proxy Registration Statement included a preliminary version of the Joint Proxy Statement for the merger, as required by Rule 14a-3(a), which was identical in all relevant respects to the materially false and misleading Definitive Joint Proxy Statement, and a copy of the Merger Agreement.  Lewis also signed a cover letter for BoA's and Merrill's Definitive Joint Proxy Statement, which was dated October 31, 2008 and filed with the SEC on November 3, 2008 on Form DEFM14A and as a prospectus supplement on Form 424(b)(3) (together with the Proxy Registration Statement, the "Proxy").  Lewis made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a BoA press release of

9

the same date. Lewis further solicited approval of the merger through his recommendation as a member of BoA's Board of Directors to vote in favor of the merger, which repeatedly appeared throughout the Proxy. In addition, Lewis signed BoA's false November 26, 2008 Proxy Supplement, which was filed with the SEC pursuant to Rule 14a-b(6).  Lewis was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and was a signatory of BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement. Because of his senior position with the Company, Lewis possessed the power and authority to control the contents of the Merger Agreement, Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.  Lewis resigned from his positions on December 31, 2009.

31.    Defendant Joe L. Price ("Price") is a citizen of the State of North Carolina.  He was at all relevant times Chief Financial Officer ("CFO") of BoA.  Price signed the Proxy Registration Statement and made numerous other false and misleading statements and solicitations throughout the Relevant Period as set forth below. Additionally, Price was a signatory of the Secondary Offering Registration Statement by virtue of his having signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by referenced into, and updated, the Secondary Offering Registration Statement.  Because of his senior position with the Company, Price possessed the power and authority to control the contents of the Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.  On January 12, 2010, the Company announced that Price was resigning as of February 1, 2010.

32.    Defendant Jonathan A. Thain ("Thain") is a citizen of the State of North

Carolina.  He was at all relevant times the CEO and Chairman of Merrill Lynch and, in that capacity, he signed the Merger Agreement on behalf of Merrill and the Proxy Statement soliciting the votes of BoA shareholders in favor of the Merrill Acquisition.  Thain made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a BoA press release of the same date.  Because of his senior position with Merrill, Thain possessed the power and authority to control the contents of the Merger Agreement, Proxy and Merrill's press releases, investor and media presentations, and other SEC filings.  Thain assumed a senior executive position managing Merrill Lynch's operations following the Merrill Acquisition.  He remained in this position until he resigned (under pressure) on January 22, 2009.

33.     Neil Cotty ("Cotty") is a citizen of the State of North Carolina. He was BoA's Chief Accounting Officer ("CAO") before the announcement of the merger with Merrill Lynch. Following the announcement of the merger, Cotty was appointed as Merrill's interim CFO, and acted as a direct liaison between BoA, including Lewis and Price, and Merrill. Cotty simultaneously continued in his capacity as BoA's CAO. Cotty signed the Proxy Registration Statement. Cotty was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.

34.     Defendant Mukesh D. Ambani ("Ambani") is a citizen of India.  He has been a member of the Board of Directors of BoA since March 2001.

35.     Defendant William Barnet, III ("Barnet") is a citizen of the State of South

11

Carolina.  He was a member of the Board of Directors of BoA throughout the Relevant Period until his resignation on July 31, 2009.

36.     Defendant Susan S. Bies ("Bies") is a citizen of the State of Tennessee.  She has been a member of the Board of Directors of BoA since June 5, 2009.

37.     Defendant William P. Boardman ("Boardman") is a citizen of the State of Ohio. He has been a member of the Board of Directors of BoA since June 5, 2009 until his resignation in May 2011.

38.     Defendant Frank P. Bramble, Sr. ("Bramble") is a citizen of the State of Delaware.  He was a member of the Board of Directors of BoA throughout the Relevant Period.

39.     Defendant Virgis W. Colbert ("Colbert") is a citizen of the State of Wisconsin. He was a member of the Board of Directors of BoA throughout the Relevant Period.

40.     Defendant John T. Collins ("Collins") is a citizen of the State of Massachusetts. He was a member of the Board of Directors of BoA throughout the Relevant Period until his resignation on July 29, 2009.

41.     Defendant Gary L. Countryman ("Countryman") is a citizen of the State of Massachusetts.  He was a member of the Board of Directors of BoA throughout the Relevant Period until his resignation on July 31, 2009.

42.     Defendant Charles K. Gifford ("Gifford") is a citizen of the State of North Carolina.  He was a member of the Board of Directors of BoA throughout the Relevant Period. According to the Company's SEC filings, Gifford entered into a retirement agreement with the Company in connection with his retirement as a Bank of America employee effective January 31, 2005. The agreement remained in effect through January 31, 2010 and, under the agreement, Gifford received compensation which exceeded the threshold set forth in the NYSE listing

12

standards and the Company's Categorical Standards in a 12-month period during the last three years.

43.     Defendant Charles O. Holliday, Jr. ("Holliday") is a citizen of the State of Tennessee.  He has been a member of the Board of Directors of BoA since September 2009 and Chairman of the Board since April 2010.

44.     Defendant D. Paul Jones ("Jones") is a citizen of the State of Alabama.  He has been a member of the Board of Directors of BoA since June 5, 2009 until his resignation on December 13, 2011.

45.     Defendant Monica C. Lozano ("Lozano") is a citizen of the State of California.  She was a member of the Board of Directors of BoA throughout the Relevant Period.

46.     Defendant Walter E. Massey ("Massey") is a citizen of the State of Georgia.  He was a member of the Board of Directors of BoA throughout the Relevant Period until his resignation in April, 2010.

47.     Defendant Thomas J. May ("May") is a citizen of the State of Massachusetts.  He was a member of the Board of Directors of BoA throughout the Relevant Period.

48.     Defendant Brian T. Moynihan ("Moynihan") is a citizen of the State of North Carolina.  He has been a member of the Board of Directors of BoA since January 2010.

49.     Defendant Donald E. Powell ("Powell") is a citizen of the State of Texas.  He has been a member of the Board of Directors of BoA since June 5, 2009.

50.     Defendant Charles O. Rossotti ("Rossotti") is a citizen of Washington D.C.  He was a member of the Board of Directors of BoA throughout the Relevant Period.

51.     Defendant Thomas M. Ryan ("Ryan") is a citizen of the State of Rhode Island.  He was a member of the Board of Directors of BoA throughout the Relevant Period until his

resignation in 2010.

52.     The Defendants referenced in ¶¶34-51 are collectively referred to as the "Individual Defendants."

## IV.    INDIVIDUAL DEFENDANTS' DUTIES

53.     By reason of their positions as officers, directors, and/or fiduciaries of BoA and because of their ability to control the business and corporate affairs of BoA, Individual Defendants owed BoA and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage BoA in a fair, just, honest, and equitable manner.  Individual Defendants were and are required to act in furtherance of the best interests of BoA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to BoA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

54.     Individual Defendants, because of their positions of control and authority as directors and/or officers of BoA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with BoA, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

55.     To discharge their duties, the officers and directors of BoA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of BoA were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

    d. Exercise good faith by ensuring that the Company's representatives are completely truthful and honest and refrain from concealing and misrepresenting facts and refrain from engaging in dishonest, deceitful and misleading statements and conduct in their communications with and statements to governmental authorities, shareholders, customers, potential customers, representatives of the media and the general public about its business affairs.

56. BoA has initiated a Code of Ethics which "provides basic guidelines of business practice, and professional and personal conduct, that [BoA employees] are expected to adopt and uphold…." Pursuant to the Code of Ethics, employees are to, *inter alia*:

    a. promptly report any violations of laws or regulations, and

    b. adhere to the system of internal controls to ensure the integrity of its consolidated financial statements.

57. Pursuant to BoA's Corporate Governance Guidelines, "[t]he basic responsibility of the Board is to oversee the Company's businesses and affairs, and to exercise reasonable business judgment on behalf of the Company. In discharging this obligation, the Board relies on the honesty, integrity, business acumen and experience of the Company's management, its outside advisors and the Company's independent registered public accounting firm." In order to fulfill this oversight duty, the Board is to perform annual self-evaluations of the Board and the Committees, and an annual review of the Chief Executive Officer's performance.

58.     Pursuant to the Audit Committee Charter, members of the Audit Committee are "responsible for assisting the Board of Directors of the Company (the "Board") in the oversight of (i) the Independent Registered Public Accounting Firm's qualifications, performance and independence; (ii) the performance of the Company's internal audit function; (iii) the integrity of the Company's consolidated financial statements; and (iv) compliance by the Company with legal and regulatory requirements." They are to review the Independent Accountant's annual report on BoA's internal quality control procedures and any material issues raised about these procedures. They also are to review periodic reports from the Corporate General Auditor regarding the internal audit. They are also responsible for maintaining and establishing adequate internal accounting controls and controls over financial reporting for the Company and to ensure that the Company's financial statements were based on accurate financial information. Finally, they are also to "discuss with management guidelines and policies to govern the process by which risk assessment and risk management are undertaken, including the assessment of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures."

59.     The Compensation and Benefits Committee is responsible for exercising oversight with respect to the establishment, maintenance and administration of the Company's compensation programs and employee benefit plans, including reviewing and approving the Chief Executive Officer's and other executive officers' compensation and recommending directors' compensation. It is responsible for reviewing and approving corporate goals and objectives relevant to Chief Executive Officer compensation, and annually evaluating the Chief Executive Officer's performance in light of those goals and objectives.

60.     The Corporate Governance Committee is responsible for exercising oversight with respect to the governance of the Board of Directors of the Company, including reviewing and reporting to the Board on matters of corporate governance and leading the Board and its committees in their annual assessments of their performance, including their supervisory oversight functions.

61.     The Enterprise Risk Committee is responsible for the oversight of the Chief Executive Officer's and senior management's responsibilities regarding the identification of, management of, and planning for, the Company's market risk, interest rate risk, liquidity risk, operational risk and reputational risk. The Committee also oversees the Chief Executive Officer's and senior management's responsibilities with respect to the Company's capital management and liquidity planning.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      The Acquisition of Countrywide.

62.     BoA is one of the world's largest financial institutions. It operates as a bank and financial holding company under U.S. law. The Company provides a full range of banking, investing, asset management, and other financial and risk-management products and services to individual consumers, small, and middle market businesses and large corporations. BoA's operational strength and profitability came primarily from providing unmatched convenience in the United States, serving more than 59 million consumers and small business relationships with more than 6,000 retail banking offices, more than 18,000 ATMs, and award winning online banking with nearly 24 million active users.

63.     These advantages were magnified by increasing defaults on sub-prime mortgage loans and related mortgage-backed securities issued and/or held by other banks. BoA claimed to have judiciously avoided significant exposure to such toxic assets leaving it in an extremely

17

strong competitive position within the financial services industry.  BoA presented itself as having

an impregnable balance sheet that would enable the Company to weather the crisis running

roughshod over the financial world.

> **1.      Bank of America Pursues a Catastrophic Business Strategy –
> Countrywide was near collapse prior to the Acquisition due to
> defaulting loans, significant losses and predatory lending practices.**

64.      On January 11, 2008, BoA and Countrywide announced they had entered into a

merger agreement whereby BoA would acquire Countrywide in an all- stock transaction valued

at $4.1 billion.  In a press release announcing the merger, which was also filed in a Form 425

prospectus with the SEC, Defendant Lewis praised the addition of Countrywide to the BoA

family:

> Countrywide presents a rare opportunity for Bank of America to add what we
> believe is ***the best domestic mortgage platform at an attractive price and to
> affirm our position as the nation's premier lender to consumers***.
> 
> * * *
> 
> We are aware of the issues within the housing and mortgage industries.  The
> transaction reflects those challenges. Mortgages will continue to be an important
> relationship product, and ***we now will have an opportunity to better serve our
> customers and to enhance future profitability***.

(Emphasis added.)[1]

65.      The press release went on to tout Countrywide's subprime initiatives, stating in

relevant part:

- Both Bank of America and Countrywide continue to work with public
  officials and community groups to explore new initiatives to help homebuyers
  and communities affected by the subprime issue.

- Bank of America and Countrywide both support efforts to fight predatory
  lending practices.

- Bank of America and Countrywide are active participants in the Hope Now
  Alliance, which has launched a letter campaign to delinquent borrowers,

---

[1] Throughout the remainder of this response, all emphasis is added unless otherwise noted.

created a counseling hotline and facilitates the sharing of best servicing practices. Bank of America also will continue Countrywide's commitment to participate in the American Securitization Forum's December 2007 reset freeze framework for 2/28 and 3/27 adjustable rate mortgages (ARMs).

- Bank of America will continue Countrywide's commitment to participate in California Governor Arnold Schwarzenegger's November 2007 subprime ARM program.

- Bank of America plans to expand the capacity and marketing of credit counseling programs and internal capacity and flexibility for loan modifications for loan workout teams following the purchase of Countrywide.

- Countrywide also has a number of programs in place designed to minimize foreclosures where feasible.

- On October 23, 2007, Countrywide announced a major expansion of its foreclosure prevention efforts by starting a $16 billion home preservation program to assist as many as 82,000 subprime hybrid [adjustable rate mortgage] customers facing [adjustable rate mortgage] resets through the end of 2008.

- On October 24, 2007, Countrywide entered into a groundbreaking partnership with the Neighborhood Assistance Corporation of America (NACA) to leverage Countrywide's market leading home retention programs and NACA's unique model for counseling borrowers.

- On December 21, 2007, Countrywide announced work on an agreement with the Association of Community Organizations for Reform Now (ACORN) to serve as a blueprint for home retention and foreclosure prevention initiatives in the mortgage industry, with a particular focus on subprime borrowers.

66.     On January 11, 2008, BoA held a teleconference to discuss its acquisition of

Countrywide.  Defendant Lewis spoke to analysts and investors:

We have asked you to join us today to talk about the acquisition of Countrywide.
* * *
Today's announcement presents a unique opportunity to acquire the mortgage capabilities and scale that are critical to our customer relationships at a time when valuations are, in fact, very compelling.  Our extensive due diligence supports our overall valuation and pricing of the transaction.
* * *
We now move to the top of both originating and servicing, with a 25% share of the origination market and a 17% share of the servicing market.  While we are

regarded as one of the most efficient mortgage shops, Countrywide has product expertise and a sales culture that tops our capabilities.  By utilizing their skill sets, we can offer more mortgage capabilities to our vast customer base.

* * *

When we marry the best practices of sales capabilities and efficient operations, we can dramatically improve the profitability of the Company.

* * *

So we view this as a one time opportunity to acquire the best mortgage platform in the business at a time when the value is very attractive.

* * *

Let me tell you just a few things that make Countrywide an important product.  As I said, they are America's largest overall originator of mortgages, with leadership positions across all sales channels and retail, wholesale, and correspondent lending.  With a $1.5 trillion dollar servicing portfolio, they service more than 9 million loans.

They have locations – either loan offices, 700-plus or banking centers, 200-plus – in nearly every state in the U.S.  These offices are focused on the most heavily-populated United States of California, Florida, and Texas, to name a few, and staffed with 15,000 mortgage sales associates.

These associates are led by a long-tenured management team that has built an incredible company with areas of operational expertise that has weathered many past cycles.  Their balance sheet has more than $200 billion in assets and roughly $55 billion in deposits.

As you are all aware, this year has been tough for them, as their model was severely impacted by market liquidity concerns and the ability to fund asset growth.  These problems play into our strengths as we have the funding with our deposit book and access to the markets to continue to grow the business.

* * *

67.    Defendant Price also spoke at the conference:

* * *We expect to close the deal in the third quarter after customary approvals from regulatory bodies as well as Countrywide shareholders.  We have completed due diligence and received both boards' approvals.

Now as Ken said, the due diligence on this deal was extensive.  We had more than sixty people on the ground for the better part of the last thirty days, with more focus picking up through the holidays.  The focus of the due diligence, as you would expect was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas.  The results of our due diligence support our overall valuation and pricing of the transaction.

68.    Defendant Price also took questions from analysts:

**RONALD TEMPLE:**  Okay, that helps.  Two other quick ones.  Do you have any protection from legal ramifications?  Obviously, Countrywide has been involved in some litigation thus far, how should we think about that?  I think Ron Mandle kind of referenced that implicitly as well.

**JOE PRICE:** I'll go back to the comment made earlier.  Again, our being clearly focused on those areas in due diligence both from a kind of corporate as well as particular product aspect, and incorporated that in the economic evaluation in arriving at our pricing or validating our pricing.

* * *

**LORI APPELBAUM, ANALYST, GOLDMAN SACHS:**  My questions were largely asked by Ron and Ron, but I will try again anyway. Joe, you mentioned that much of the due diligence was spent on the MSR credit and legal; and that was a factor in how you set the exchange ratio. If you could provide any key assumptions across those three measures at all in coming to the exchange ratio.

**JOE PRICE:**  No, not really.  Let me clarify, Lori.  What we did is we did our due diligence; and obviously our exchange ratio was established based on market pricing and all the other attributes that you would consider in that.

What I was meaning is that our due diligence findings were supported or fully encompassed in when we set that exchange ratio, so.

But no, I am not prepared to provide any details specific as to specific estimates on particular items. Obviously, that will change up through the date of application of purchase accounting once the deal is approved in early third quarter period.

69.     Defendant Lewis also spoke to analysts at the conference:

**JEFF HARTE, ANALYST, SANDLER O'NEILL:**   Good morning, guys.  Most of my questions have been hit.  I have two left.  One, I understand the due diligence process from the credits and what is in the portfolio standpoint.  Can you talk a little bit more about how you got comfort on the litigation and potential regulatory site?  Because we are looking at one of the biggest subprime issuers out that. With subprime having a lot of problems, and government kind of entities looking into it, and lawsuits potentially looming, how do you get comfortable with your potential exposures on those two fronts?

**KEN LEWIS:**          Well, all I can say is we had a lot of advice from both our internal group and also from two other entities that put some parameters around it.

70.     Despite these repeated specific questions on potential legal issues facing

Countrywide, Defendants Price and Lewis refused to inform investors about the state

21

investigations surrounding Countrywide's predatory lending practices.  Defendants Price and Lewis also refused to inform investors that they performed minimum due diligence or that their due diligence uncovered major problems and potential liabilities.

71.     The statements above were false and/or misleading because Countrywide was under investigation in several states, including Arizona, Connecticut, Florida, Iowa, Michigan, North Carolina, Ohio, Texas, and Washington for predatory lending practices.  Further, the Defendants did not reveal to investors that the merger would require BoA to take on $28.6 billion in high-risk ARM loans and seriously threaten the adequacy of the Company's capitalization.  This material information was knowingly or recklessly disregarded by Defendants and the failure to disclose this information constituted a violation of Section 10(b) and Rule 10b-5.

72.     The true facts, which were known by the Defendants but concealed from the investing public, or recklessly disregarded, during the Relevant Period were as follows:

   a. The Company's acquisition of Countrywide would have catastrophic consequences on the Company's capital position and overall operations;

   b. The acquisition of Countrywide would require BoA to take on $26.8 billion in high-risk ARM loans and seriously threaten the adequacy of the Company's capital levels;

   c. The Countrywide acquisition would cause the Company to incur significant losses because of the reckless lending practices, as further detailed below;

   d. BOA would be exposed to billions in expenses related to lawsuits and investigations of Countrywide and its executives for predatory and fraudulent lending practices, as well as wrongful acts against investors;

   e. BOA's due diligence was completely inadequate, as evidenced by the now public information regarding Countrywide's fraudulent loan practices and extremely lax underwriting guidelines;

   f. The Company's capital base was not adequate to withstand the toxic assets and legal issues brought to the merger by Countrywide; and

22

g.   BOA would be required to pay for legal fees and fines incurred by Countrywide's executives.

73.   On April 29, 2008, Countrywide reported a shocking first quarter loss of $893 million, reflecting $3 billion in credit-related charges.  Countrywide wrote off $1.5 billion in losses on its residential loan portfolio alone, ten times the amount written off the previous year. The news led to Standard & Poor's decision to downgrade Countrywide debt to junk-bond status. Countrywide shares dropped a precipitous 10 percent in one day.

74.   Over the next week, it became apparent that the merger was going forward despite the fact that Countrywide was clearly a dying company.  Further, instead of buying Countrywide at a discount as the merger agreement anticipated, BoA would be paying a 20 percent premium. An analyst for Friedman Billings Ramsey suggested that a fair price would be $2.00 per share as opposed to the $7.00 per share price that BoA was preparing to pay.  The analyst went on to write that, "Many investors believe that Bank of America does not want the negative publicity from renegotiation to ruin a solid reputation.  ***This thesis ignores the marks that Bank of America will have to take if it closes the deal as is, and it could put Bank of America's well-capitalized levels at risk***."  As the realization of what BoA was acquiring crept into the market, share prices began to descend, dropping 11 percent between May 1 and May 7, 2008.

75.   On June 25, 2008, Illinois Attorney General, Lisa Madigan, filed a lawsuit against Countrywide alleging the company had engaged in unfair and deceptive practices in an effort to induce homeowners to apply for risky mortgages beyond their means.  California Attorney General, Jerry Brown, filed a similar lawsuit on the same date alleging Countrywide had broken the state's false advertising and unfair business practices laws.  On July 1, 2008, Florida Attorney General Bill McCollum filed a lawsuit against Countrywide making similar allegations.

76.    BoA completed the purchase of Countrywide on July 1, 2008.  Defendant Lewis

was quoted in a press release as stating:

> Mortgages are one of the three main cornerstone consumer financial products
> along with deposits and credit cards.  This purchase significantly increases Bank
> of America's market share in consumer real estate, and as our companies
> combine, we believe Bank of America will benefit from excellent systems and a
> broad distribution network that will offer more ways to meet our customers' credit
> needs.

77.    On July 21, 2008, BoA announced better-than-expected second quarter 2008

results, beating analysts' estimates.  In a conference call held to discuss these results, Defendant

Price stated, "We think the worst is behind us on value declines, as evidenced in our results for

the quarter."  Almost immediately, BoA's stock began to trade higher.

78.    On August 6, 2008, Connecticut State Attorney General, Richard Blumenthal

("Blumenthal"), filed suit against Countrywide seeking to recover damages for violations of state

consumer protection and banking laws.  Blumenthal stated in relevant part:

> ***Countrywide conned customers into loans that were clearly unaffordable and
> unsustainable, turning the American Dream of homeownership into a
> nightmare.*** When consumers defaulted, the company bullied them into workouts
> doomed to fail. Countrywide crammed unconscionable legal fees into
> renegotiated loans, digging consumers deeper into debt. ***The company broke
> promises that homeowners could refinance, condemning them to hopelessly
> unaffordable loans.***
>
> Countrywide was at their side -- as an insolvency enabler. Countrywide inflated
> homeowner incomes to qualify them for loans they couldn't pay back and misled
> consumers about loan terms.
>
> Countrywide stacked the deck and the deal against its customers: Our goal is to
> un-stack the deck -- and undo the deals -- restoring fairness and fiscal sense to
> mortgages. I will fight for restitution -- money back to homeowners used and
> abused by Countrywide -- as well as fines and forfeitures to the state. Our lawsuit
> seeks to invalidate loans that violate state law, allowing consumers to shed illegal,
> unreasonable fees and conditions that leave them at the precipice of foreclosure.
> We must vigorously fight predatory lending practices that trap consumers on a
> debt treadmill.

79.     On August 12, 2008, West Virginia Attorney General Darrell McGraw brought similar claims against Countrywide.  On August 24, 2008, Indiana Attorney General Steve Carter filed a similar lawsuit, making it the sixth state to file suit against Countrywide.

**2.     Bank of America performs no due diligence on Countrywide's Mortgage-Backed Securities**

80.     Clearly BOA did not conduct adequate due diligence or it would have discovered the information that now has come out through the investigations of the SEC and Federal Trade Commission.  The type of information that BOA should have learned through due diligence includes, but is not limited to:

a.   the extremely lax underwriting guidelines used by the company in originating loans;

b.   the company's pursuit of a "matching strategy" in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

c.   the high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

d.   Countrywide's definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

e.   the high percentage of Countrywide's subprime originations that had loan to value ratio of 100%, for example, 62% in the second quarter of 2006;

f.   Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%;

g.   Countrywide's unlawful practices in the servicing of loans, including excessive mark-up fees for default-related services, a practice which BOA Home Loans Servicing also apparently did; and

h.   Countrywide's unlawful misrepresentations and omissions to customers in bankruptcy proceedings.

81.     If BOA conducted due diligence as represented by Lewis and Price, then their representations regarding the acquisition were clearly false and/or they omitted material information regarding Countrywide.  Furthermore, had Defendants conducted sufficient due diligence and learned of all the legal risks, they should not have agreed to indemnify Countrywide's executives for any future legal actions.  BOA will undoubtedly incur billions more to resolve all the outstanding legal claims, as well as enormous legal fees defending the numerous lawsuits that have been filed against Countrywide and its executives.

82.     Beyond the enormous financial consequences because of the legal problems, the Company has suffered significant financial consequences due to Countrywide's reckless lending practices.  According to the Associated Press, BOA reported a loss of $1.6 billion in the fourth quarter of 2010 after its costs related to soured home loans increased.  BOA reported a loss of $3.6 billion for 2010 as compared to $2.2 billion for 2009.  The Associated Press further reported that the deep slump in the real estate market has continued to hamper BOA more than its competitors because of its 2008 purchase of Countrywide.

83.     As reported by the *New York Times*, BOA's financial results for 2010 are a result of "gradual improvements in its core banking business as offset by charges linked to its disastrous 2008 acquisition of Countrywide."  BOA took a non-cash charge of $2 billion to reflect a write-down for good will on its acquisition of Countrywide.   BOA was also forced to set aside $4.1 billion in the last quarter to settle claims by investors with soured mortgage securities, citing evidence that the underlying mortgages did not conform to the underwriting standard or lacked proper paperwork.  As reported by the *New York Times*, BOA estimates the extent of the potential put-back liability in the future is in the $7 billion to $10 billion range, which is significantly less than the tens of billions in put-back risk some analysts have warned

the Company faces.  This estimate is clearly unrealistic in light of the recent flux of lawsuits and mounting evidence of Countrywide's fraudulent practices.

84.     BOA cannot blame the hard economic times for its woes.  As reported by *Reuters*, BOA is the only major bank to post a fourth-quarter loss in 2010, and its home loan business lost more than $12 billion in the last two years.  As noted on *Huffingtonpost.com*, BOA will likely argue that the mortgage losses are largely due to the housing crisis that is out of its control. However, the evidence points otherwise.  In October 2010, BOA Default Servicing Executive Rebecca Mairone stated that of the 1.3 million customers that are more than 60 days delinquent on their mortgages, 85% are Countrywide originated loans.

### 3.     Bank of America paid Mozillo's legal fees and agreed to cover Countrywide executive's reparations

85.     As a result of all of the litigation and investigations, former Countrywide executives have incurred a staggering amount of legal fees and had various penalties imposed upon them. This includes Countrywide Chief Executive Angelo Mozilo ("Mozilo"), Chief Operating Officer and President David Sambol ("Sambol") and Chief Financial Officer Eric Sieracki ("Sieracki"). For example, On June 4, 2009, the United States Securities and Exchange Commission ("SEC") filed a civil lawsuit which alleged Mozilo, Sambol, and Sieracki deliberately misled investors by misrepresenting that Countrywide was a quality lender of mostly prime mortgages and had prudent underwriting standards, while it actually was actively assuming risk through its aggressive and unorthodox lending practices in order to build and maintain market share in the booming mortgage market.

86.     On Tuesday, June 9, 2009, BoA spokesman Robert Stickler said that Mozilo's legal fees and expenses for the SEC suit were covered by an indemnity clause: "Under the agreement that [Mozilo] had when Countrywide was an independent company, Countrywide

continued to be responsible for his legal expenses for actions taken while he was an employee." Presumably, Sambol and Sieracki also benefit from a similar indemnity clause so as to require BoA to cover their legal fees as well.

87.     According to an article published on October 16, 2010 in *The Wall Street Journal* entitled "Mozilo Agrees to Pay $67.5 Million", Mozilo entered into a settlement agreement in the SEC suit whereby he will pay $22.5 million in civil penalties and $45 million in disgorgement that will be returned to Countrywide shareholders. The article stated that the disgorgement amount will most likely be paid by BoA or its insurers.  Further, BoA has stated that it will advance funds to Mozilo pursuant to the indemnification provisions of the corporate bylaws.

88.     Additionally, Sambol agreed to pay $5.5 million in penalties and $5 million in disgorgement (which, again, will be paid by BoA) and Sieracki agreed to pay $130,000 in civil penalties.

### 4.     Bank of America is on the hook for payments related to Contrywide's Actions

89.     BoA sought a solution to Countrywide's legal issues, and on October 6, 2008, the Company entered into and announced a historic settlement agreement with eleven state regulators who had brought suit against Countrywide.   The settlement required BoA to restructure approximately 400,000 residential mortgages, dropping interest rates to as low as 2.5 percent.  News of the settlement hit the market like a tidal wave.  BoA shares were pounded based on the Company's disappointing news, falling 27 percent or $8.45 by the close of trading on October 7. For California alone, the settlement was valued at $3.5 billion while Illinois home owners received $190 million in relief.  BoA agreed to waive $79 million in late fees and $56 million in prepayment penalties.  BoA spokesman, James M. Mahoney, admitted that the Company had prepared for such a loss when they acquired Countrywide, but investors were not

28

informed of the potential litigation until the suits were filed.  All told, BoA was forced to set aside $8.7 billion to meet the terms of the settlement agreement.  The Company also announced disappointing earnings and cut its dividend as part of an effort to raise more capital.  These announcements could not have come at a worse time as BoA was preparing to close on a stock offering in an effort to raise approximately $10 billion to shore up its capital levels.  BoA's massive settlement later included numerous other states, totaling 39 different states.

90.     BoA's legal problems from the Countrywide acquisition did not stop there.  Because of the fraudulent actions of Countrywide and its chief executives, BOA has had to pay billions more in settlement of other claims, and there are numerous other lawsuits still to be litigated.  Of the claims that have been settled, BOA has had to pay the following:

a.  The May 2010 Consent Judgment in the Federal Trade Commission case demands Countrywide & BAC Home Loans Servicing pay $108 million to be refunded to homeowners overcharged prior to July 2008.

b.  In August 2010, BOA agreed to pay $600 million to end a class-action case filed against Countrywide by investors alleging that Countrywide hid how risky its business had become during the housing market's boom years.

c.  The October 2010 settlement with the SEC[2] required BOA to pay over $50 million in disgorgement penalties assessed against Angelo Mozilo and David Sambol.

d.  In December 2010, BoA reached an agreement with Freddie Mac and Fannie Mae to resolve a faulty mortgage loan dispute involving bad mortgages sold by Countrywide, wherein BOA paid nearly $1.3 billion to Freddie Mac and more than $1.3 billion to Fannie Mae on December 31, 2010.[3]

e.  On December 21, 2001, the Department of Justice announced that BoA had entered into a consent agreement whereby it would pay $335 million to settle these claims based on Countrywide's discriminatory loan practices

---

[2] This is one of only a few SEC lawsuits against individual executives that has followed the recent financial crisis.
[3] Fannie Mae and Freddie Mac identified many billions of dollars of fraudulent loans that were originated by Countrywide and sold to Fannie Mae and Freddie Mac through false representations and warranties.  The $2.6 billion worth of payments combined with potential losses on future repurchases from government-sponsored enterprises adds up to $3 billion in expenses.

      f.   On February 10, 2012, the U.S. Attorney for the Eastern District of New York announced a $1billion settlement with BoA related to BoA and Countrywide's mortgage fraud.

91.     Unfortunately, it appears the legal problems have only begun.  On October 19, 2010, *Bloomberg* reported that Pacific Investment Management Co, Blackrock Inc., and Fed Reserve Bank of New York are seeking to force BOA to repurchase soured mortgages packaged into $47 billion of bonds by Countrywide.  In December 2010, Allstate sued Countrywide and several executives over $700 million in toxic mortgage-backed securities that the insurer bought from Countrywide beginning in 2005.  In its most recent quarterly report filed with the SEC, BoA said it, Countrywide, and its Merrill Lynch unit have been named as defendants in suits related to the sales of more than $375 billion in mortgage-backed securities.  As reported by *Reuters* on January 27, 2011, thirty-three investors did not join the August 2010 class action settlement, including several large state pension funds and asset managers.

### B.    The Acquisition of Merrill Lynch

### 1.    BoA Hastily Seizes The Opportunity To Acquire Merrill, And Agrees To Pay A Significant Premium For The Company.

92.     As *The Wall Street Journal* reported on September 15, 2008, Ken Lewis had "long coveted" Merrill. Indeed, Merrill, a 94-year old pillar of Wall Street, possessed significant prestige and respect for which Lewis and the Charlotte-based BoA had "long clamored," and its acquisition was "the final piece" of Lewis's plan to make BoA the country's biggest bank by assets and arguably its most powerful financial institution, as Lewis himself acknowledged during an October 19, 2008 interview on *60 Minutes*:

        Question: You always wanted Merrill Lynch.

        Lewis: We've always thought that was the best fit for us.

        Question: You were drooling for Merrill Lynch.

Lewis: We have always thought it was . . . . Yep.

93.     As the financial markets collapsed in 2008, Defendant Lewis got the chance to acquire the company he coveted. On Sunday, September 7, 2008, the U.S. Government seized the country's two largest mortgage companies, known as Fannie Mae and Freddie Mac, placed them into conservatorships, and agreed to inject as much as $100 billion into each institution to remedy its capital shortfall. Days later, on September 11, 2008, American International Group, Inc. ("AIG") saw its stock price plummet 31% in the face of looming rating agency downgrades and resulting collateral calls, and immediately began negotiating a deal to, in effect, sell itself to the U.S. Government for $85 billion to avert imminent bankruptcy.

94.     The next day, Friday, September 12, 2008, it became clear that Lehman, one of Wall Street's most venerable institutions, would have to find a buyer or be forced to file for bankruptcy by September 15. Lehman's bankruptcy – the largest in U.S. history – was certain to further destabilize the financial markets by causing lenders to halt crucial daily funding to other financial companies with large exposure to similar mortgage-linked assets, leaving those companies vulnerable to collapse.

95.     As Merrill CEO Thain realized, Lehman's bankruptcy would almost certainly trigger Merrill's own collapse. Indeed, in a February 19, 2009 deposition taken by the New York Attorney General's office, Thain testified that he knew that Lehman's failure would likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008.  As Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill. Accordingly, Thain immediately began searching for a buyer for Merrill.

96.     As Thain later stated, he knew that Lewis "always wanted" to acquire Merrill. Thus, on the morning of Saturday, September 13, Thain called Lewis at his North Carolina home and said, "Ken, I think we should talk about a strategic arrangement." Lewis, who had been rebuffed in several previous attempts to acquire Merrill, jumped at the opportunity, telling Thain he could meet him in New York that afternoon.

97.     By 2:30 p.m. that day, Thain and Lewis were sitting alone and face-to-face in BoA's corporate apartment in the Time Warner Center in New York. Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America." Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here. I want to buy the whole company, not invest 9 to 10 percent.'" Thain ultimately agreed to sell all of Merrill to BoA that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

98.     Accordingly, on September 14, 2008, only one day after Defendant Thain had first contacted Defendant Lewis to discuss a strategic investment, Defendant Lewis agreed on BoA's behalf to pay $50 billion for Merrill in an all-stock transaction whereby each share of Merrill would be exchanged for 0.8595 shares of BoA.  The agreement valued Merrill stock at $29 per share – a 70% premium to Merrill's $17 per share closing price on September 12.

### 2.     BoA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End

99.     Unbeknownst to shareholders and investors, BoA's and Merrill's senior officers spent a large portion of their limited time during the merger discussions negotiating the bonuses that Merrill's senior officers and employees would receive as part of the deal. In fact, Defendant Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC.

Defendants Lewis and Thain were involved in and kept continually apprised of these bonus negotiations. Lewis negotiated the bonus agreement through Greg Curl, BoA's Vice Chairman of Corporate Development.  According to Thain's deposition testimony, he was kept informed of the negotiations, and all the terms of the agreement, through Greg Fleming, Merrill's President and Chief Operating Officer.

100.    According to a February 8, 2009 article in *The New York Times*, during these bonus negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone." Subsequent media reports revealed that the list also provided for $30 million for Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai, President of Global Wealth Management Robert McCann, and General Counsel Rosemary Berkery. In total, Merrill sought the right to pay up to $5.8 billion in discretionary year-end and other bonuses to its executives and employees.

101.    Significantly, during these discussions, Merrill's senior executives also insisted that BoA agree to allow Merrill to accelerate payment of these bonuses so that they could be paid in December 2008 – before the merger was scheduled to close on January 1, 2009, and before Merrill's financial results for the fourth quarter became public. This accelerated schedule deviated from Merrill's compensation practices and regular bonus schedule, under which annual bonuses were not even calculated, let alone paid, until January – after the close of the fiscal year.

102.    Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the merger Proxy, "pay for performance" was "the core of [Merrill's] compensation policy," and executive bonuses were "paid in January for performance in the prior fiscal year." The March

2008 Proxy also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations."

103.    The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy – bringing Merrill to the precipice of collapse.

104.    Ultimately, BoA agreed to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger.  This highly material amount was equal to 12% of the value of the merger, and was in fact 26% more than BoA had earned during the first two quarters of 2008. It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

105.    The $5.8 billion in bonuses that BoA agreed to allow Merrill to pay was actually materially greater than the bonuses that Merrill itself had internally planned to pay prior to the collapse of the financial industry that occurred in the second half of 2008.  Prior to the merger negotiations, Merrill had reduced its internally-projected bonus pool from $5.8 billion to $5.1 billion, or by 16.5%.  Thus, the agreement with BoA permitted Merrill to pay bonuses that were at least $700 million greater than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

34

106. BoA also permitted Merrill to pay these bonuses before the merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule. As Thain testified in his February 19, 2009 deposition: "The timing . . . was determined when we signed the merger agreement. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

107. The acceleration of the bonuses was material to BoA shareholders and investors for several reasons. First, paying the bonuses in December meant that Merrill executives would be able to reap gigantic bonuses despite Merrill's 2008 financial performance.

108. Second, the accelerated schedule eliminated any chance that BoA might reduce or eliminate Merrill's bonus payments once BoA assumed control of Merrill after the merger closed. As the Associated Press reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later." As Merrill's executives knew, BoA's compensation policies were substantially less generous than Merrill's, making it likely that BoA would severely curtail Merrill's bonuses – especially if Merrill suffered large losses during the fourth quarter – unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated the other merger terms. This was confirmed by BoA's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and BoA's – so big, in fact, that Smith gave "an example of someone in a role at Merrill that got paid three dollars, and that same role in Bank of America would have gotten paid one dollar."

109. Third, paying billions of dollars in bonuses before the merger closed meant that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

110.   On *PBS Frontline*, Lewis stated that the bonuses were so large that they ruined the celebratory toast he had hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [of the merger process]. And frankly, it extends things to the point that I have never really been real happy by the time that champagne pours. Usually, you're mad at each other by then and you drink it politely and then leave. . . . And that was about how I felt with this one."

### 3.   Lewis Presents The Merger To Investors While Concealing The Bonus Agreement

111.   On the morning of Monday, September 15, 2008, BoA and Merrill issued a joint press release in which they announced that BoA had agreed to acquire Merrill for $50 billion in stock in a deal scheduled to close on January 1, 2009. In an investor conference call and press conference that day, Defendants Lewis, Thain, and Price made numerous statements designed to assure investors that the large premium was justified because Merrill was financially stable.

112.   For example, Lewis emphasized that BoA had conducted a "comprehensive[]" analysis of Merrill's financial condition, which had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much lower risk profile" than it previously possessed. Lewis added that "we have very similar methodology valuations and we have very similar marks. The structures – we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

113.   On September 18, 2008, the first day of the Class Period, BoA and Merrill each filed copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms. The Merger Agreement did not say a word about the $5.8 billion in bonuses that BoA had agreed to

let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the merger closed. To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not, without the prior written consent of BoA:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

114.    Thereafter, between September 18 and November 3, 2008, when the definitive Proxy was filed with the SEC on Forms DEFM14A and 424(b)(3) and mailed to shareholders, BoA and Merrill continued to make numerous positive statements reassuring investors about their financial condition, the merger, and the combined company. For example, on October 7, 2008, BoA conducted the Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion. In the press release announcing the offering, Lewis underscored BoA's "strength and stability," and stated that the merger "should significantly enhance our earnings." On a related investor and analyst conference call, Defendant Price, responding specifically to a question regarding any need for additional capital in connection with the merger, affirmatively stated that no new capital would be necessary.

115.    Similarly, on October 16, 2008, Merrill issued a press release in which Thain stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal."

116.    On October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to the "Troubled Asset Relief Program," or TARP. On October 19,

37

2008, Lewis appeared on *60 Minutes* and assured investors that BoA had actually benefited from the financial crisis because, in contrast to other banks, consumers were attracted to BoA's stability and thus were making deposits at a record pace, enhancing BoA's capital position. Lewis represented that the Merrill transaction proved that BoA's capital strength had enabled it to defeat and absorb weaker banks, and that BoA had "won" in its competition with "Wall Street."

117.    Lewis further stated that BoA did not need the TARP funding it had recently received, but that Secretary Paulson had forced Lewis to accept it with "no negotiations." Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and [] the right thing for America." In contrast to institutions that needed TARP funds to repair their capital bases, Lewis stated that BoA would "use [the TARP funds] to grow loans and to make more net income."

### 4.    During October And November 2008, Merrill's Losses Grow To At Least $15.5 Billion Before The Shareholder Vote

118.    Unbeknownst to BoA's shareholders and investors, throughout October and November 2008 – while BoA and Merrill were soliciting shareholder approval of the merger – Merrill was suffering undisclosed losses that were so large that they threatened the viability of Merrill, and were so severe that BoA could not absorb them and proceed with the merger.

119.    In October 2008, the first full month after the merger was announced, Merrill suffered losses of more than $7.5 billion.   As Thain admitted in his interview with *PBS Frontline*:

> If you look at what actually happened in the fourth quarter, <u>October was the worst month</u>, which is not surprising, because it comes right after the

Lehman bankruptcy. <u>We lost about $7 billion in the month of October</u>. . . . October was by far the worst.

120.    These losses were highly material. The losses Merrill reported in the single month of October were greater than the "record" profit Merrill reported in the entire year of 2006. In fact, after excluding quarter-end adjustments, these losses represented the greatest monthly loss in the company's history (and the second greatest monthly loss if such adjustments were included). The losses were also almost three times greater than the $2.7 billion in pre-tax losses Merrill had suffered in September 2008 – the month that Lehman filed for bankruptcy and the markets collapsed, threatening Merrill's solvency and precipitating the sale of Merrill to BoA. Significantly, over the course of the first three quarters of 2008, Merrill had lost an average of approximately $6.5 billion per quarter on a pre-tax basis.  The losses Merrill suffered in the <u>month </u>of October 2008 alone exceeded the average <u>quarterly </u>loss Merrill had reported in 2008 by roughly $1 billion.

121.    In November 2008, Merrill continued to suffer billions of dollars in losses. According to an expert analysis of Merrill's weekly loss data for the fourth quarter – which was prepared by Congress to determine "what loss trends could reasonably be deduced from the loss data available to [BoA's] decision makers" at the time – by November 14, Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

122.    Merrill's total pre-tax loss for the two months of October and November exceeded $15.5 billion – an amount that was substantially more than the record $12.8 billion pre-tax loss Merrill reported for the entire 2007 fiscal year.  As *The Wall Street Journal* reported on February 5, 2009, after reviewing an "internal document" which reported the losses, "<u>internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and</u>

December was looking even worse." In addition to this highly material $13.3 billion loss, according to a September 8, 2009 letter from the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans." Merrill's Chief Accounting Officer, David Moser, has testified that on November 13, more than three weeks prior to the shareholder vote, he informed Defendants Price and Cotty that Merrill would take an approximately $2 billion goodwill writedown. On November 20, Moser confirmed in an email that "we will be taking a significant writeoff of the goodwill … approximately $2.2 billion." Including this $2.2 billion goodwill charge, Merrill's total losses by the end of November 2008 totaled at least $15.5 billion.

123.    Judged by any measure, Merrill's undisclosed losses were highly material to BoA shareholders and investors, as they brought Merrill to the brink of insolvency, and, as Lewis would publicly acknowledge when belatedly disclosing the taxpayer bailout, BoA could not absorb them without the government's assistance.  Indeed, Merrill's fourth quarter pre-vote losses were substantially greater than the $5.8 billion BoA had earned through the first nine months of 2008, and more losses were expected before year-end.  Further, these losses were entirely unexpected by the investment community. After Merrill highlighted the "significant progress in balance sheet and risk reduction" it had supposedly achieved in its October 16, 2008 press release, discussed above in ¶86, analysts had concluded that Merrill had significantly improved its financial condition in preparation for the merger with BoA.  Analysts' consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter profit of $0.44 per share. For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse

forecasted that Merrill would earn a fourth quarter profit of $0.63 per share and noted: "The strongest positive in the [third] quarter was the progress made on working down the investment bank's 'high risk' inventory. . . .  With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%." That same day, Deutsche Bank forecasted that Merrill would earn a fourth quarter profit of $0.54 per share and reported, "Merrill's [third] quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America." Similarly, on October 17, 2008, Buckingham Research Group reported that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter.  Likewise, on October 19, 2008, Oppenheimer concluded that Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet . . . ahead of the pending merger with Bank of America."

### 5. BoA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote

124.   Defendants Lewis, Thain, Price, and Cotty knew of Merrill's losses as they occurred.  Indeed, Cotty became acting CFO of Merrill immediately after the merger was announced, and acted as a direct liaison between Merrill and Defendants Lewis and Price. In addition, according to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team," to continuously monitor Merrill's financial condition.  As Thain wrote in a January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to our p&l [profit and loss statements], our positions and our marks.

41

125.    Moreover, Thain testified in his deposition taken by the New York Attorney General that BoA executives not only had access to this detailed financial information, but personally received regular updates as the fourth quarter progressed. Thain testified that Merrill held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what was happening" throughout the fourth quarter.

126.    During Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, all received daily, "step-by-step" updates on Merrill's financial condition:

> Question: And was Bank of America inside your books? . . . Would they have known what was happening, what the projections were, how bad things actually were because of the Lehman collapse and what else had happened in the market?

> Thain: Yes, absolutely. I believe in being totally transparent. They had acquired us. We were completely transparent with them. They had inserted the person who had been their chief accounting officer – he became the acting chief financial officer for the Merrill businesses. We generate a daily profit and loss statement. They were getting that daily profit and loss statement, so they knew about the losses at the same time we did.

> Question: Which was when?

> Thain: We get an update every day.

> Question: So they would have known all the way along?

> Thain: All the way along.

> Question: Step by step?

> Thain: Yes.

127.    Indeed, BoA has admitted that it was aware of Merrill's financial condition. As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said

that '<u>we have not disputed that we were kept informed about the financial condition of the</u> <u>company</u>.'"

128.     As set forth below, although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware of the losses that occurred during October and November 2008. Lewis was asked by one Representative whether BoA received "<u>detailed financial reports every</u> <u>week </u>from Merrill Lynch after signing the merger agreement on September 15th?"   Lewis replied, "<u>That is true</u>."   The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . . ? Isn't that true?" Again, Lewis replied, "<u>It is true</u>." At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that BoA stationed at Merrill immediately after the merger announcement reported Merrill's losses to Lewis before the shareholder vote.  Lewis responded, "I apologize if I haven't been clear. The – <u>we did have people there, and we did know that there were losses</u>. <u>And that was clear both at our</u> <u>company and theirs</u>."

129.     Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections.  I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

130.     Two business days after BoA shareholders approved the deal, the Board of Directors held a meeting and and received details of the $14 billion pretax fourth-quarter loss. The Board was also advised that the Merger would be far more damaging to BoA's earnings than had been disclosed to the public and shareholders.

6.      **Internal BoA Documents And Sworn Testimony Establish That Defendants Recognized That Merrill's Losses Should Be Disclosed In Advance Of The Shareholder Vote**

131.    Internal BoA documents and the sworn testimony of BoA executives establish that BoA's most senior officers were not only aware of Merrill's losses as they occurred, but immediately recognized how devastating those losses would be to the combined company.  For example, on November 5, 2008, Cotty sent an email concerning Merrill's October results to Defendant Price with the striking notation: "Read and weep."  Similarly, Merrill's Corporate Controller acknowledged in a November 9, 2008 email to Defendant Cotty how poor Merrill's results were, telling him that the "[n]umbers speak for themselves."

132.    On November 12, Defendants Price and Cotty received a forecast for Merrill's fourth quarter.  In addition to setting forth Merrill's actual loss of $7.536 billion in October, the report stated that Merrill's fourth quarter losses were expected to be more than $8.9 billion pre-tax, or $5.4 billion after tax, assuming "no additional marks" or "other significant market dislocation items." These losses were so severe that they caused Defendant Price to immediately question whether they should be disclosed.  "It prompted me to ask the disclosure question," Price testified to the SEC.

133.    Thus, that same day, Defendant Price informed BoA's General Counsel, Timothy Mayopoulos, that Merrill was forecasting a loss of approximately $5 billion after-tax for the quarter.  Mayopoulos knew at once that BoA was likely required to disclose these losses to shareholders voting on the merger.  As Mayopoulos testified to the New York Attorney General, he responded to this news by telling Price that "$5 billion is a lot of money," and "a disclosure was likely warranted."

134.    Similarly, BoA's outside counsel, Wachtell, concluded that Merrill's losses should be disclosed to investors.  After meeting with Price on November 12, Mayopoulos

44

consulted Wachtell about disclosure of Merrill's losses.  According to the handwritten notes of Wachtell senior partner Eric Roth, Wachtell was told that Merrill "had a terrible October," and that "ML lost $7B in October!" (emphasis in original). Roth's notes further show that Wachtell was asked, "do we have to get the # out?"

135.    According to Roth's notes, Wachtell conducted research on whether disclosure of Merrill's losses was required, and Roth reviewed a formal memo previously prepared by the firm which concluded that, under Section 14(a), "there was a duty" to disclose material facts arising after the issuance of a proxy. (emphasis in original). Significantly, as set forth in Roth's notes, Wachtell's research had concluded that BoA had a "duty to bring to sh. all info material to vote" "@ time of vote under federal proxy" law.

136.    The next day, November 13, Mayopoulos and other BoA in-house counsel met with Roth and other senior Wachtell partners to discuss disclosure of Merrill's losses.  At this meeting, as reflected in contemporaneous notes taken by Roth, BoA's in-house counsel and Wachtell agreed that Merrill's losses had to be disclosed prior to the shareholder vote.

137.    According to Roth's handwritten notes of this meeting, the lawyers discussed the fact that the consensus among analysts was for Merrill to report a profit for the fourth quarter, but that, unbeknownst to investors, Merrill would "be deep in the red." In fact, according to BoA's own internal analysis of analysts' expectations at this time, the vast majority (9 out of 13) of analysts covering Merrill were forecasting the company to earn a profit for the fourth quarter of 2008.  For example, as BoA was aware, Credit Suisse was predicting that Merrill would earn a profit of $0.63 per share, Deutsche Bank was predicting that Merrill would report a profit of $0.54 cents per share, and Oppenheimer was predicting that Merrill would report a profit of $0.32 cents per share.  In fact, Deutsche Bank had raised its estimate for Merrill's fourth quarter

results on October 16, 2008, after learning of Merrill's third quarter results, which reflected "a clean-up prior to its year-end merger with Bank of America."

138.    Roth's notes further show that, at this meeting, Mayopoulos recommended that "given ML's # – rec. both co. report [their financial results] week or so before" the vote. As Mayopoulos testified to the New York Attorney General, "I communicated to Wachtell that I believe my initial assessment was that a disclosure was warranted."

139.    Wachtell agreed that BoA was required to make a disclosure about Merrill's deteriorating financial condition.  Significantly, as Roth wrote, the lawyers "all agree must be some discl[osure]" of Merrill's losses beyond what was in the Proxy.  After discussing the contents of such a disclosure, the lawyers discussed the date for the disclosure and reached "consensus – 11/28!" because it was a "week before sh. meeting." (Emphases in original).

140.    That same day, November 13, Defendants Price and Cotty were informed by Merrill's Chief Accounting Officer, David Moser, that Merrill would take an approximately $2 billion goodwill writedown during the fourth quarter. That charge brought Merrill's actual pretax losses for the quarter incurred to date to more than $10 billion – and the quarter was not even half over.

> **7.    As Merrill's Losses Mount, Defendants Acknowledge That Disclosure Of Merrill's Losses Would Cause Shareholders To Vote Against The Merger – And Abruptly Reverse Their Decision To Disclose The Losses**

141.    On November 14, Defendant Price met with Defendant Thain.  Although it had been agreed that Price would inform Thain of BoA's decision to disclose Merrill's financial condition before the shareholder vote, Price did not inform Thain that BoA's in-house and outside counsel had determined that a disclosure concerning Merrill's financial condition had to be made. Instead, according to the sworn testimony of Christopher Hayward, Merrill's Finance

46

Director, Price merely asked Thain "does Merrill plan to do any intra-quarter disclosure," to which Thain responded "No." Price did not discuss the issue further with Thain.

142.    By November 16, Defendants knew that Merrill's fourth quarter losses were continuing to materially increase. That day, Defendant Price emailed Cotty that Merrill "had a pretax loss of $10.942 billion" for the fourth quarter, not including the approximately $2 billion goodwill charge Merrill had decided it needed to take. Thus, by November 16, Defendants Price and Cotty knew that Merrill's losses for the fourth quarter would be at least $13 billion pre-tax, and $8.5 billion after-tax.

143.    On November 18, Defendant Price met again with Mayopoulos to discuss disclosure of Merrill's losses. Significantly, Price did not tell Mayopoulos that Merrill's pre-tax losses for the quarter had increased from $8.9 billion to $13 billion in the five days since they had last met. Instead, at the meeting, Price and Mayopoulos discussed the fact that disclosure of Merrill's losses would impact shareholders' assessment of the transaction, and likely result in shareholders voting the merger down. As Mayopoulos testified, if Merrill's losses were disclosed, "I knew there was a possibility that shareholders would vote down the merger." Indeed, set forth prominently in the top right-hand corner of Mayopoulos's handwritten notes from his meeting with Price was the question, underlined by Mayopoulos for emphasis: "What happens if neg. shh vote"?

144.    Two days later, Price and Mayopoulos abruptly reversed course and decided that BoA did not have to disclose Merrill's losses. On November 20, Mayopoulos and Price met in person, and spoke on the phone with senior Wachtell partners Ed Herlihy and Nicholas Demmo. Once again, Defendant Price did not inform counsel that the losses were now in excess of $13 billion, including the $2.2 billion goodwill charge, leaving counsel with the impression that

Merrill's losses were billions of dollars less than they truly were.  Indeed, as Herlihy and Mayopoulos testified, at this time they still understood that Merrill's losses would only be $8.9 billion pre-tax (or approximately $5 billion after-tax) – or more than $4 billion less than what they actually were. They also had no idea that the losses had increased by nearly 50% in less than one week.

145.    At the meeting, Mayopoulos informed Herlihy and Demmo that no disclosure of these losses would be made.  A principal basis for this determination was that Merrill's fourth quarter losses were supposedly not material because Merrill had suffered between $2 billion and $9.8 billion of after-tax losses in the last five quarters, and the $5 billion of after-tax losses which Mayopoulos had been told Merrill would report were within that range. Significantly, despite Price's knowledge of Merrill's true losses, he made no mention of the fact that Merrill's fourth quarter losses were more than $13 billion on a pretax basis, and $8.5 billion on an after-tax basis – or approximately 70% higher than Mayopoulos and Wachtell believed.

146.    Moreover, BoA's unsupported and arbitrary "materiality" analysis had no legal basis. As Mayopoulos admitted in his sworn testimony before the New York Attorney General, in reversing the prior decision to disclose Merrill's losses, neither he nor anyone else at BoA performed any legal research regarding BoA's disclosure duties.  He did not read a single court decision or SEC rule, nor did he ask any in-house counsel at BoA to research the issue.

147.    In addition, upon changing their recommendation regarding disclosure, neither Mayopoulos nor Price asked Wachtell or any other counsel to opine as to BoA's disclosure responsibilities – notwithstanding the fact that, as of November 12, Mayopoulos, Price and Wachtell had already determined that some disclosure of the losses prior to the vote was necessary. As Herlihy testified before the New York Attorney General, "we were not disclosure

counsel. We never worked on any of their filings or disclosures relating to the filings." Herlihy further testified that BoA did not request a legal opinion from Wachtell concerning BoA's reversal of its decision to disclose Merrill's losses.

> **8.      As The Vote Approaches, Senior Management Is Informed That Merrill's Quarterly Losses Will Exceed $16 Billion, And Ignores Repeated Entreaties To Disclose The Losses**

148.    Although BoA had unilaterally determined that Merrill's losses were supposedly immaterial so long as they were not the greatest quarterly loss in Merrill's history, by late November, Merrill's mounting losses caused Defendant Price to ask Mayopoulos to review the MAC clause in the Merger Agreement and advise him whether BoA had grounds to terminate the merger by invoking the MAC. According to a February 5, 2009 article in *The Wall Street Journal*, "shortly before Thanksgiving," BoA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in its merger agreement." The article further stated that the debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

149.    On December 1, Mayopoulos met with Defendant Price and Greg Curl (BoA's Vice Chairman of Corporate Development) to discuss whether BoA had grounds to invoke the MAC. Mayopoulos informed Price and Curl that, based on the information that had been given to him (which was that Merrill's fourth quarter after-tax losses were expected to be $5 billion), he did not believe that BoA had grounds to invoke the MAC.

150.    Later that day, Defendant Cotty emailed updated loss figures to Defendant Price. According to Cotty's email, Merrill's October and November losses now totaled approximately $12.7 billion pre-tax, excluding the $2.2 billion goodwill writedown of which they both knew. Including that writedown, Merrill's total pre-tax losses for October and November <u>were now</u>

approximately $15 billion. Cotty's email also contained a forecast for Merrill to lose an additional $1 billion in December, bringing Merrill's pre-tax losses for the quarter to at least $16 billion.

151.    Certain BoA executives insisted that if the Company was not going to terminate the merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts. According to the February 5, 2009 *Wall Street Journal* article quoted above, "[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses," and this disagreement continued right up until "the night before the vote." As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, that investors should know about this before they vote."

152.    Indeed, as Merrill's losses mounted, both BoA senior officers and Merrill's auditor concluded that Merrill's losses should be disclosed to shareholders voting on the merger so that they could cast an informed vote.  In late November, BoA Treasurer Jeffrey Brown told Defendant Price that "we should disclose" because "the losses were meaningful enough." Price refused to do so.  In response, Brown warned him that he "didn't want to be talking through a glass wall over a telephone" if the losses were not disclosed – an admonition from one of BoA's own senior executives that the failure to disclose the losses could rise to the level of a criminal offense.

153.    Similarly, at approximately the same time, Merrill's auditor, Deloitte & Touche, recognized that Merrill's losses were sufficiently material that they warranted disclosure to shareholders.  According to the sworn testimony of Deloitte partner Thomas Graham, a "few days prior to the vote," Graham and Deloitte supervisor Ven Kocaj informed Merrill's Chief

Accounting Officer David Moser and Corporate Controller Gary Carlin that Merrill's losses were "material subsequent events to what occurred at the end of September that would be relevant for parties that were voting on [the merger]" and "sizable enough [to] probably warrant disclosure." As Graham further testified, he told Moser and Carlin that, "given the losses through what it looks like will be November when it closes, given the fact you have another couple of billion dollars coming down the road in goodwill impairment, we believe it's prudent that you might want to consider filing an 8-K to let the shareholders, who are voting on this transaction, know about the size of the losses to date."

154.    On December 3, two days before the shareholder vote, Defendants Lewis, Price, Cotty and Thain met specifically to discuss Merrill's staggering fourth quarter losses. At this meeting, Cotty informed Lewis, Price, and Thain that Merrill's losses for November would be billions of dollars more than reflected in current forecasts – news that, according to Defendant Cotty's sworn testimony, created a "very somber environment." After reviewing Merrill's loss information, Defendants Lewis and Price decided to revise Merrill's loss report to include an additional $2 billion of losses for November.

155.    The revised loss report, entitled "2008 4Q Pacing & FY Forecast Scenario," was circulated shortly after the meeting concluded. The report set forth Merrill's November losses at more than $4.9 billion – or more than $1 billion per week – and stated that Merrill's total fourth quarter losses would exceed $14 billion, or approximately $9 billion after taxes.

156.    However, as these officers knew, even that report materially understated Merrill's losses. As the first page of the revised 2008 4Q Pacing & FY Forecast Scenario report emphasized, it did not include any "goodwill writeoff," even though BoA's senior officers, including Lewis and Price, knew that Merrill had decided in November to take a $2.2 billion

goodwill writeoff. With the writeoff included, Merrill's expected fourth quarter losses were now more than $16.2 billion dollars on a pre-tax basis, and more than $10.5 billion on an after-tax basis – exceeding even the unsupported range that BoA had set for disclosure of Merrill's losses on November 20. Moreover, BoA's and Merrill's most senior officers now knew, two days before the shareholder vote, that Merrill's pre-tax losses for October and November alone would be at least $15 billion, and that the fourth quarter of 2008 was already by far the worst quarter in Merrill's history.

157.   After receiving this revised loss report on December 3, Price met with Mayopoulos concerning an unrelated litigation.  At the end of that meeting, Price casually mentioned to Mayopoulos that "there had been revisions to the $5 billion after-tax forecast for Merrill Lynch's fourth quarter results." Although Price knew that Merrill's revised fourth quarter losses were now more than $10.5 billion after taxes and had exceeded even BoA's threshold for disclosure, Price misled Mayopoulos into believing that Merrill's losses were billions of dollars less.  Specifically, according to Mayopoulos's sworn testimony before the New York Attorney General, the SEC, and Congress, Price informed Mayopoulos that Merrill's losses were only "$7 billion after taxes." Based on the false and incomplete information provided to him by Defendant Price, Mayopoulos again concluded, without performing any legal analysis or consulting outside counsel, that no disclosure needed to be made to shareholders voting on the transaction on December 5.

158.   As set forth more fully below, when Mayopoulos learned days after the shareholder vote that Merrill's expected fourth quarter losses were materially higher than Price had informed him and sought to confront Defendant Price about this discrepancy, Mayopoulos was immediately terminated without explanation, and escorted from BoA's premises.

52

159.     At the same time that Merrill was collapsing, BoA's own financial condition was materially deteriorating to the point where, as Lewis acknowledged when he sought the taxpayer bailout, BoA would be unable to absorb the losses suffered by Merrill.  As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the merger, BoA had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion – the first quarterly loss in BoA's history.  In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted BoA's own financial deterioration, writing that, "[a]s they [BoA senior executives] themselves noted the other night at our meeting, even on a standalone basis, the firm is very thinly capitalized," BoA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

### 9.     While Merrill Deteriorates, The Billions In Merrill Bonuses Are Finalized

160.     While the financial condition of Merrill deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees. According to Thain's deposition testimony, in early November 2008, he and BoA's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion. On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review. Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses on December 22; and employees would receive

their cash awards by December 31. On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

161.    Throughout this process, BoA's senior executives knew of the size and timing of the bonus payments. As Thain stated to *PBS Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

### 10.    BoA And Merrill Issue The Materially False And Misleading Proxy

162.    Notwithstanding the facts set forth above, the Proxy failed to disclose at any time before the shareholder vote on the merger <u>any</u> information about the billions of dollars in losses that had been suffered by either Merrill or BoA during October and November. The Proxy also failed to disclose that Merrill would pay billions of dollars of bonuses before the merger's scheduled closing date, the payment of which further weakened Merrill's financial condition.

163.    On November 3, 2008, the Proxy was filed with the SEC on Forms DEFM14 and 424(b)(3) and mailed to shareholders. The Proxy made no mention of the $7.5 billion in fourth quarter losses that Merrill had suffered by this date.

164.    The Proxy also affirmatively misrepresented that Merrill would <u>not</u> make any discretionary bonus payments before the merger closed on January 1, 2009. Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch <u>will not</u>" pay any compensation that was "not required." In addition, the Merger Agreement, which was attached to the Proxy as Appendix A, repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K, described above at ¶84. Moreover, by incorporating Merrill's prior SEC filings, including the March 2008 Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual

bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance," as set forth above.

165.    Section 14(a) and Rule 14a-9 required BoA to disclose all material facts to allow BoA shareholders to make an informed decision on the merger, and to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events. By failing to disclose information regarding Merrill's fourth quarter 2008 losses in advance of the shareholder vote, and by failing to disclose the bonus agreement, Defendants violated the federal securities laws.

166.    Significantly, in the weeks after the Proxy was mailed to shareholders, BoA and Merrill updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or BoA, or the accelerated bonus payments.  Specifically, on November 21, 2008, BoA and Merrill each filed a Form 8-K pursuant to SEC Rule 425, updating the Proxy to disclose that they had settled certain derivative litigation relating to the merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the merger – without disclosing any information concerning Merrill's losses, the secret bonus agreement, or BoA's own deteriorating financial condition.

167.    Then, on November 26, 2008, with the shareholder vote less than ten days away, BoA again supplemented the Proxy with the stated purpose of bolstering BoA's stock price, by filing a letter from Lewis to shareholders pursuant to Rule 14a-6(b) that assured shareholders that BoA's financial condition remained extremely strong despite the upheaval in the market. In that letter, which was written specifically to address investors' "deep concerns about . . . whether financial institutions have enough capital," Lewis represented that BoA was "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the

world." Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above, including either the secret bonus agreement or Merrill's staggering losses.

168.    On December 5, 2008, BoA shareholders convened in Charlotte, North Carolina to vote on the merger, while Merrill shareholders convened in New York.  BoA and Merrill shareholders voted in favor of the merger.  Lewis represented that the merger was the crowning event in BoA's corporate history, noting that, "it puts us in a completely different league."

> **11.    Almost Immediately After Shareholders Approve The Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses Are Materially Higher Than What He Has Been Told, Seeks To Confront Price About That Discrepancy, And Is Immediately Fired**

169.    On Tuesday, December 9, 2008, the second business day following the shareholder vote, Defendants Lewis and Price met with the BoA Board to discuss Merrill's deteriorating financial condition. At the meeting, Defendant Price presented to the Board the $14 billion pre-tax loss figure ($9 billion after-tax) that Defendants Price, Lewis, Thain, and Cotty discussed on December 3, which still failed to include the $2.2 billion goodwill writedown.  At that meeting, Price acknowledged that Merrill's massive fourth quarter losses were material to investors, stating that the "magnitude" of the losses was "quite significant."

170.    Mayopoulos, who attended the December 9 Board meeting, testified that he was "surprised" by the size of the loss, as he had been told by Price on December 3 that Merrill's losses were only $7 billion.  As a result, after this meeting, Mayopoulos sought to confront Price about the fact that Merrill's pre-vote losses were materially greater than Price had represented to him.  According to Mayopoulos, he "want[ed] to talk to him [Price] about what's changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not."

However, Mayopoulos was told that Price was unavailable for the rest of the day.  Mayopoulos decided to meet with Price the next day.

171.    The next morning – before Mayopoulos could speak to Price – Mayopoulos, who had served as BoA's General Counsel for five years, and who had been told by Defendant Lewis on September 14, 2008 that he would be the General Counsel of the combined company, was summarily terminated without explanation, instructed to leave his personal effects behind, and immediately escorted from BoA's headquarters.  Mayopoulos was replaced as General Counsel by Brian Moynihan, who had not practiced law in 15 years, did not have an active license to practice law, and was promoted to another executive position within weeks of replacing Mayopoulos.

172.    Mayopoulos later testified to Congress:

> I was stunned. I had never been fired from any job, and I had never heard of the general counsel of a major company being summarily dismissed for no apparent reason and with no explanation.

*     *     *

> I could not understand why I was dismissed so abruptly. I was surprised that I was given no opportunity to say goodbye to my colleagues and staff, and why there was no orderly transition of my work to Mr. Moynihan. No one, including Mr. Moynihan, ever contacted me to discuss what I had been working on. Nearly a year later, I still do not know why I was terminated, who was involved in the decision to do so, or what their reasons or motivations were.

### 12.    Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him

173.    On December 12, 2008, one week after BoA shareholders voted to approve the merger, Defendants Lewis and Price received a report showing that Merrill would report a pretax loss for the quarter of at least $18 billion.  As a result, according to a February 5, 2009 *Wall*

57

*Street Journal* article, Defendant "Lewis told Bank of America directors in a conference call that the bank might abandon the acquisition, which was supposed to close in two weeks."

174.     Thereafter, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that BoA had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis's deposition testimony.   Secretary Paulson immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal Reserve.

175.     On the evening of December 17, 2008, Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and other Treasury and Federal Reserve officials.   Lewis began the discussion by reporting the dire financial condition of the combined company. Lewis stated that BoA was projected to lose $1.4 billion in the fourth quarter – the Company's first quarterly loss in its history. Lewis then reported that Merrill's massive fourth quarter losses were so large that they would materially impact BoA's tangible common equity and Tier 1 capital ratios.   Defendant Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses for the quarter of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes. Lewis stated that BoA had concluded that a material adverse change had occurred in Merrill's financial condition, and that it would terminate the merger pursuant to the MAC.   In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

176.     Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for BoA and Merrill.   In

response, Lewis raised the idea of BoA receiving a taxpayer bailout – including a "Citi-type" guarantee on $50 billion of assets – to proceed with the transaction, according to Price's handwritten notes. Secretary Paulson asked for time to allow the Treasury and Federal Reserve to analyze the situation. Lewis agreed to supply the Federal Reserve with information on Merrill's and BoA's fourth quarter performance and risk exposures, and to wait to hear back from the regulators before taking further action. Following this meeting, Lewis provided the regulators with the current and prior loss forecasts that BoA executives had been receiving throughout the fourth quarter.

177.    After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses.  As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email: "This claim is not credible."  On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise[]" was dubious:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter – albeit picking up significant[ly] around mid-November and carrying into December – Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect.

178.    Senior Federal Reserve officials repeated this conclusion in the Federal Reserve Merger Analysis, which stated:

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, [BoA] management's contention that the severity of [Merrill's] losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.

179.    According to the Federal Reserve Merger Analysis, BoA should not have been surprised by Merrill's losses because Merrill's largest risk exposures were well known to BoA. As that Analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "large losses stemming from exposures to financial guarantors."  These exposures and losses, Federal Reserve officials concluded, "were clearly shown in Merrill Lynch's internal risk management reports that [BoA] reviewed during their due diligence." In addition, Federal Reserve officials concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BoA] itself is also active in [] these products."

180.    The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BoA] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

181.    As noted above, evidence emerging as a result of federal and state investigations of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-December 2008. Among other things, before the shareholder vote, BoA's executives (i) were fully aware that Merrill would report a loss for the fourth quarter of at least $16.2 billion; (ii) were so concerned with the magnitude of these losses that they discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were found not to be credible by senior government officials when they claimed that Merrill's losses and goodwill writedowns were "surprising," and had not materialized until after the shareholder vote.

182.    On December 19, 2008, Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Federal Reserve officials. According to Defendant

Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses in excess of $21 billion pre-tax, and that BoA would likely invoke the MAC. Notably, the additional losses consisted principally of the $2.2 billion goodwill charge that BoA's senior management had been aware of since mid-November. Secretary Paulson asked Lewis what needed to be done to have the deal proceed. Lewis raised two possibilities: the government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BoA.

183.    Price's handwritten notes show that Federal Reserve officials unequivocally told Lewis that a decision by BoA to invoke the MAC would reveal that BoA's prior statements about the benefits of the merger were false, and would cause the market to seriously question BoA's financial condition and the judgment of its management. Chairman Bernanke testified before Congress that he told Lewis that "an attempt [by BoA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capacity to consummate significant acquisitions, its overall risk management processes and the judgment of its management."

184.    On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further. Secretary Paulson bluntly told Lewis that the Federal Reserve would remove BoA's senior management if it tried to terminate the transaction. According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America. I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

185.   The threat to fire Lewis had its intended effect. Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [BoA] were going to call the MAC."  After receiving this threat, Lewis reversed course. As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

186.   That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BoA would proceed with the merger and would work with federal regulators on designing a bailout package. Lewis made the decision to proceed with the merger even though he knew that the impact of Merrill's losses would harm BoA shareholders.  Specifically, at his deposition, Lewis was asked whether BoA's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them.  He responded that BoA's investors were harmed over the "short term," which he defined as "[t]wo to three years."

187.   Recognizing that his conduct would likely result in legal liability for misleading shareholders, Lewis next took the extraordinary step of trying to obtain protection from the Government against shareholder suits.  According to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]." Thus, Lewis had asked Bernanke "whether he could use as a defense that the [Government] ordered him to proceed for systemic reasons."  Bernanke told Lewis "no."

188.    Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors could formally advise Lewis that invoking the MAC was not in the best interests of BoA, and whether Lewis could use such a letter as a defense from suit.  Alvarez responded that such a letter was not "appropriate."  Alvarez also underscored that Lewis faced liability for BoA's lack of disclosures to shareholders in advance of the shareholder vote.  Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is material to investors.  There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . .  His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BoA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.

189.    In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [BoA] made for the shareholder vote.

### 13.    With BoA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout

190.    Ultimately, in order to proceed with the merger, Lewis requested and obtained a $138 billion taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of preferred stock, which diluted the ownership interests of other BoA shareholders, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill. In a BoA Board meeting on December 22, 2008, Lewis and Price told the BoA Board that Government officials had agreed to this bailout package.  According to the meeting minutes, Lewis informed the BoA Board that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against

63

the adverse impact of certain Merrill Lynch assets"; that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation"; and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

191.    Lewis also made clear that management's recommendation to proceed with the merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

192.    After Lewis informed the BoA Board that the federal government had "confirmed that they will provide assistance to the Corporation," Lewis deliberated over "the importance of the timing of the announcement of the commitment of the Fed and Treasury." Recognizing the material risk that BoA would be severely downgraded by credit rating agencies and that shareholders would demand that the merger be terminated if BoA disclosed the Government bailout before the merger closed – and knowing that, if the merger failed, he would be fired – Lewis made the conscious decision not to disclose the bailout until after the merger closed. Specifically, when Lewis learned that the Government would have to disclose that it was providing funding to BoA if the Government's commitment was reduced to writing, Lewis immediately advised the BoA Board that the Company would not enter into a written agreement

because it could not complete the merger if this information was disclosed in advance of the merger's close. On December 22, 2008, Lewis sent the following email to the Board with the subject "Privileged and Confidential to Board of Directors," evidencing his desire to conceal this information until after the merger was complete:

> I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, <u>of course, we do not want</u>.

193.   On December 30, 2008, Lewis and Price met with the BoA Board to update them concerning the U.S. Government's commitment, and further underscored that the deal with the U.S. Government was firm and detailed. According to the minutes of this meeting, "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators."   Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation."   Price "reported that he had confirmed to Mr. Bernanke and Mr. Paulson the reliance of the Board and management on the federal regulators' assurances."   Lewis added that:

> management of the Corporation had <u>clearly explained to the federal regulators the terms and conditions required</u> by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009. In return, he reported, management has received <u>strong assurances from all relevant federal regulators and policy makers</u> that the Corporation will receive adequate and appropriate assets to <u>neutralize the impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009</u>.

194.   Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize the impact . . . resulting from the Corporation's acquisition of Merrill Lynch," Lewis

again determined to withhold this information from BoA shareholders and investors. According to the minutes of the BoA Board's December 30, 2008 meeting: "Mr. Lewis explained that written assurances would not be received <u>before January 1, 2009</u>" – the date the merger was scheduled to close – precisely "because any written assurances would require formal action by the Fed and Treasury, <u>which formal action would require public disclosure</u>." Notes from that meeting reflect that Lewis told the Board that BoA could not disclose the bailout, because it would "disrupt" the close of the merger.  According to these notes, BoA was "Treating [the agreement] very close – Don't want leak."

195.    Accordingly, rather than disclose information about the Government bailout at that time, BoA determined to announce it "in conjunction with [BoA's] earning release on January 20, 2009," weeks after the merger was set to close.

> **14.    Internal BoA Emails Establish That, At The Same Time BoA's Senior Officers Decided Not To Disclose The Bailout Prior To The Merger's Close, They Internally Acknowledged That The Market Was Being Misled As To Merrill's True Financial Condition**

196.    Significantly, at the same time Defendants Lewis and Price were obtaining the taxpayer bailout, BoA's senior officers and BoA's counsel were acknowledging internally that the failure to disclose the bailout and Merrill's losses was affirmatively misleading the market, which had "no inkling" that Merrill had suffered such devastating losses. These same emails make clear that BoA's senior officers knew that disclosure of this information would cause the deal to "fall apart," and "confirm [the] materiality of the fourth quarter losses."

197.    On December 17, 2008, the same day that Lewis approached the government for the bailout, Jeff Brown, BoA's Treasurer, sent Defendant Price an email regarding a conversation he had had with Standard & Poor's. Brown made clear that he was "concerned" that S&P had no idea of Merrill's true financial condition:

> What concerns me is that they are not expecting poor results from ML this quarter and he [S&P] said the ratings committee noted substantial improvements in ML risk/balance sheet management.
>
> \*        \*        \*
>
> But in light of ML's 4Q performance that we know relative to what they know …. This could be an issue and result in another downgrade. This is just my view, but they clearly think ML is more healthy than they are and that they have shed the worst risks.

198.    Brown further noted in that email that S&P believed that BoA was in significantly better shape than its competitors because, unlike them, BoA did not need government assistance:

> They are also moving to a new approach to assess relative ratings in this environment. Basically all this means is that there are different rankings within a particular rating – ie) we are A+; another institution may have the same headline but be worse-off on a relative basis since they may need government programs to survive. The view of S&P is that we do not need government assistance … ie) we are now A+ regardless. He noted that previously 5 institutions on a global basis were rated at the same or higher than BAC. Now there are only 3 intuitions [sic] that would be considered higher and 2 of those were domestic (I presume WFC and JPM).

199.    Similarly, on December 17, 2008, Brown received an email from a member of BoA's Corporate Treasury Department regarding a conversation she had had with Moody's. According to that email, Moody's had stated in this meeting that "you guys [BoA] are getting a great deal on this acquisition. We think very highly of the Merrill franchise." The email concluded with the sarcastic comment, "So, we have that going for us."

200.    Despite the fact that Brown had again expressed his "concerns" that the market was being misled, Defendant Price took no action.  Thus, two days later, on December 19, Brown forwarded the email he had received on December 17 directly to in-house disclosure counsel at BoA. Brown wrote the following on that email:

> Moody's comment on the deal – again another sign agencies don't know what is coming.

201.    In-house counsel immediately forwarded Brown's email to Wachtell. Wachtell then spoke to both Brown and BoA's in-house counsel. According to notes of that December 19 discussion that were taken by Wachtell senior partner Peter Hein, the parties agreed that the failure to disclose Merrill's massive losses had resulted in a "fundamental issue of lack of credibility" with the market. Significantly, the parties also agreed that, if those losses were disclosed prior to the merger close, it would cause rating agency downgrades, resulting in the deal falling apart, and confirming the materiality of Merrill's undisclosed losses:

> Fundamental issue of lack of credibility with rating agencies to whom Target may not have disclosed the ever increasing losses for the fourth quarter; if Target now belatedly makes that disclosure, likely to have adverse impact on perception of rating agencies (who do not have an inkling this is coming); such a rating agency reaction would, if such reaction occurred after deal fell apart, presumably confirm materiality of the fourth quarter losses[.]

202.    These emails show that, at the time that BoA's most senior executive officers decided not to disclose the taxpayer bailout and Merrill's losses, they knew that (i) this information was highly material to investors; (ii) the market had no idea that Merrill had suffered such massive losses in the fourth quarter; (iii) disclosure of these material facts before the merger closed would inevitably cause rating agency downgrades and result in the deal falling apart; and (iv) the market was being misled by the failure to disclose these facts. Indeed, on December 22, 2008, only five days after Brown informed Defendant Price that BoA's ratings depended on keeping the rating agencies in the dark about Merrill's losses and the need for the bailout, Lewis told that BoA Board that "of course, we do not want" public disclosure of these facts.

### 15.    The Merger Is Consummated While Defendants Lewis And Price Continue To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout

203.    By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter.  On that day – its last as an independent company – it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to BoA shareholders.

204.    On January 1, 2009, BoA closed its purchase of Merrill without ever disclosing to investors that (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) BoA had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the combined company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse.

205.    Based on BoA's representations to the market as of that date, analysts had previously estimated that BoA would independently report earnings of $0.08 per share for the fourth quarter of 2008.   A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy. Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told. Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

### 16.    The Prices Of BoA Securities Plummet As The Truth Emerges

206.    News that Merrill and BoA would report much higher losses than expected began to leak into the market by no later than Sunday, January 11, 2009, when a Citigroup analyst forecast fourth quarter losses at Merrill to be $6 billion, including $7 billion in writedowns on Merrill's "high risk assets," and further wrote that BoA might post a $3.6 billion fourth-quarter

loss and slash its quarterly dividend from $0.32 to $0.05 per share. In response, shares of BoA stock fell from $12.99 at the close of the market on the prior trading day to $11.43 on Monday, January 12, 2009 – a 12% drop.

207.    According to a June 1, 2009 article in the *Sydney Morning Herald*, on January 14, 2009 in Sydney, which was January 13 in New York, Merrill executives in Australia had informed Australian bond traders that Merrill was going to report "awful" news that was going to cause the market to "plummet" on January 15, 2009. One trader reported that he was told that the "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night," and that the news would "start to leak out." BoA shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009 on heavy volume.

208.    On the morning of January 15, 2009, *The Wall Street Journal* shocked investors with news that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co.," citing larger-than-expected but unquantified fourth quarter losses at Merrill. In response, BoA announced that it was moving its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned. The price of BoA stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009, on extremely heavy trading volume – an 18% drop which left BoA's share price at an 18-year low.

209.    During a BoA Board of Directors meeting on January 15, 2009, BoA director Gifford sent an email to fellow director May stating "it's screw the shareholders!!" [sic]

210.    On the morning of January 16, 2009, the Treasury Department issued a press release disclosing the Government bailout of BoA.  Later that morning, *The Wall Street Journal* published an article entitled "Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury

to Inject $20 Billion More: Stock at 1991 Level," in which it speculated that Merrill's losses

"could total in excess of $10 billion," and further reported that:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co.
> acquisition, Bank of America Corp. is expected to receive an emergency capital
> injection of $20 billion from the Treasury, which will also backstop as much as
> $120 billion of assets at the bank, said people familiar with the plan. Reports of
> the unexpected Merrill losses sent Bank of America shares to their lowest levels
> since 1991 . . . . Thursday's 18% stock-market drop gives the Charlotte, N.C.
> bank a market value of $41.8 billion, a sum below the $46 billion in shares it
> originally offered for Merrill. Its shares have lost over 40% of their value in the
> past seven trading sessions. The developments angered some Bank of America
> shareholders, who began to question why Chief Executive Kenneth Lewis didn't
> discover the problems prior to the Sept. 15 deal announcement. Many also wanted
> to know why he didn't disclose the losses prior to their vote on the Merrill deal on
> Dec. 5, or before closing the deal on Jan. 1.

211.    Later that morning, BoA belatedly disclosed that: (i) Merrill had suffered a fourth

quarter after-tax net loss of $15.31 billion, or more than $21 billion before taxes, which

accounted for more than 55% of Merrill's full year after-tax loss of $27 billion; (ii) BoA had

suffered its own net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government was

injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed

to provide protection against further losses on $118 billion of risky assets, primarily from

Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional

preferred stock. With the fourth quarter losses, Merrill had lost a staggering ($24.44) per share

for the year, and ($9.62) per share for the quarter, far below the fourth quarter profit for Merrill

that the market had been led to expect. Similarly, BoA's own losses meant that it had lost ($0.48)

per diluted share, a far cry from the $0.08 per share profit that analysts expected.  In addition,

BoA announced that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per

share.

212.    The $24 billion of preferred shares that BoA was required to sell to the U.S.

Government under the terms of the bailout carried an 8% dividend rate, which would require

BoA to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BoA common stock by approximately thirty cents per share for 2009. Further, BoA was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee – all of which further reduced its future earnings and diluted the value of its common stock. In addition, BoA's acceptance of this Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a status that was so unique that, apart from BoA, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected BoA to additional Government oversight and restrictions.

213.    On the January 16, 2009 conference call to discuss these results, Lewis admitted that BoA was unable to absorb Merrill's losses without the taxpayer bailout:

> We went to our regulators and told them that we would not – that we could not close the deal without their assistance. As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

214.    Analysts and the financial press reacted with astonishment. On January 16, Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [Government] involvement."

215.    As Lewis admitted on *PBS Frontline*, "The magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."

216.    After the close of markets on January 16, 2009, as Defendant Price had been told would happen prior to the close of the merger, Moody's downgraded BoA's credit ratings due to

"the disclosure of substantial losses at Merrill Lynch," and Fitch downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

217.    On Saturday, January 17, 2009, *The New York Times* published a lengthy article describing Merrill's massive losses as "devastating" and revealing that BoA's management had contemplated exercising the MAC after the vote but prior to the closing of the merger, and was dissuaded by the Government from doing so.  In addition, *The Wall Street Journal* reported that BoA's own weakened financial condition contributed to the need for Government aid.

218.    The next trading day, Tuesday, January 20, 2009 (following the weekend and the Martin Luther King, Jr. holiday), J.P. Morgan reported that BoA's fourth quarter losses were "enormous," adding:

> [BoA] announced a major agreement with the U.S. government that reflected primarily the <u>poor acquisition of [Merrill] done without due diligence</u> as well as some assets from its own weakening portfolio. [Merrill] over-represented its value <u>given its large amount of high risk assets and the level of permanent dilution for [BoA]</u> from the acquisition will likely be higher.

219.    In direct response to these disclosures, BoA shares fell from $8.32 per share, their opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 – a drop of 38.7% on extremely heavy volume over two days of trading.

220.    In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about this materially adverse information, BoA stock plummeted from $12.99 to $5.10 – a decline of 60% – causing a market capitalization loss of <u>over $50 billion</u>. Even at this price, BoA common stock, Preferred Securities, and Debt Securities all remained artificially inflated because news of the massive, accelerated bonuses had yet to be disclosed.

221.    Then, on January 21, 2009, just before midnight, the *Financial Times* broke the story of Merrill's accelerated bonus payments, reporting that Merrill had taken "the unusual step

of accelerating bonus payments by a month last year." Although the amount of the bonuses was not public, the *Financial Times* further reported that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December," before the merger closed. According to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as "ridiculous," especially in light of Merrill's losses.

222.    After the *Financial Times* broke the news of Merrill's bonus payments, on the morning of January 22, 2009, Defendant Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job. According to Thain's *PBS Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

223.    On January 22, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

224.    The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments – as well as the fact that they were paid amidst historically large losses – was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitated in part by "[v]itriol . . . over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated." Similarly, the *Charlotte Observer*

reported that "Thain's departure follows a raft of damaging revelations in recent days, including biggerthan-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed." The *Los Angeles Times* reported on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the Associated Press reported that "on Thursday came the news that [Lewis] didn't block Merrill management's decision to dole out billions of dollars in early bonuses even as [Lewis] was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

225.    Even after the *Financial Times* report, BoA and Merrill steadfastly refused to disclose or confirm the size of the bonuses. As the *Charlotte Observer* reported on January 23, 2009, BoA still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

226.    The news of Merrill's bonus payments immediately triggered an investigation by the New York Attorney General. On January 23, 2009, *The New York Times* reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized . . . as 'large, secret last-minute bonuses.'" In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.
>
> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

227.   In response to the disclosure of Merrill's enormous, accelerated bonus payments, BoA stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009. All told, BoA common stock fell 56% – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 – in response to these belated disclosures, destroying tens of billions of dollars in shareholder value.  Similarly, the price of BoA's Preferred Securities fell by over 30% in the aggregate, while the Debt Securities likewise fell by 6.4% in the aggregate during this same time period.

**C.     Defendants Cause BoA to Issue Materially False and Misleading Statements**

**1.     The Countrywide Merger**

228.   On January 11, 2008, BoA and Countrywide announced they had entered into a merger agreement whereby BoA would acquire Countrywide in an all stock transaction valued at $4.1 billion.  In a press release announcing the merger, which was also filed in a Form 425 prospectus with the SEC, Defendant Lewis praised the addition of Countrywide to the BoA family:

> Countrywide presents a rare opportunity for Bank of America to add what we believe is ***the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier lender to consumers***.
>
> * * *
>
> We are aware of the issues within the housing and mortgage industries.  The transaction reflects those challenges. Mortgages will continue to be an important relationship product, and ***we now will have an opportunity to better serve our customers and to enhance future profitability***.

229.   The press release went on to tout Countrywide's subprime initiatives, stating in relevant part:

- Both Bank of America and Countrywide continue to work with public officials and community groups to explore new initiatives to help homebuyers and communities affected by the subprime issue.

76

- Bank of America and Countrywide both support efforts to fight predatory lending practices.

- Bank of America and Countrywide are active participants in the Hope Now Alliance, which has launched a letter campaign to delinquent borrowers, created a counseling hotline and facilitates the sharing of best servicing practices. Bank of America also will continue Countrywide's commitment to participate in the American Securitization Forum's December 2007 reset freeze framework for 2/28 and 3/27 adjustable rate mortgages (ARMs).

- Bank of America will continue Countrywide's commitment to participate in California Governor Arnold Schwarzenegger's November 2007 subprime ARM program.

- Bank of America plans to expand the capacity and marketing of credit counseling programs and internal capacity and flexibility for loan modifications for loan workout teams following the purchase of Countrywide.

- Countrywide also has a number of programs in place designed to minimize foreclosures where feasible.

- On October 23, 2007, Countrywide announced a major expansion of its foreclosure prevention efforts by starting a $16 billion home preservation program to assist as many as 82,000 subprime hybrid [adjustable rate mortgage] customers facing [adjustable rate mortgage] resets through the end of 2008.

- On October 24, 2007, Countrywide entered into a groundbreaking partnership with the Neighborhood Assistance Corporation of America (NACA) to leverage Countrywide's market leading home retention programs and NACA's unique model for counseling borrowers.

- On December 21, 2007, Countrywide announced work on an agreement with the Association of Community Organizations for Reform Now (ACORN) to serve as a blueprint for home retention and foreclosure prevention initiatives in the mortgage industry, with a particular focus on subprime borrowers.

230.    The statements above were false and/or misleading because Countrywide was under investigation in several states, including Arizona, Connecticut, Florida, Iowa, Michigan, North Carolina, Ohio, Texas and Washington for predatory lending practices.  Further, the Defendants did not reveal to investors that the merger would saddle BoA with $30 billion in loan losses and seriously threaten the adequacy of the Company's capitalization.

231.    The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

    a.    The Company's acquisition of Countrywide would have catastrophic consequences on the Company's capital position and overall operations;

    b.    The acquisition of Countrywide would saddle BoA with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to billions in losses related to Countrywide's predatory lending practices;

    c.    The Company's capital base was not adequate to withstand the toxic assets and legal issues brought to the merger by Countrywide.

232.    On January 18, 2008, BoA held a teleconference to discuss its acquisition of Countrywide.  Defendant Lewis spoke to analysts and investors:

We have asked you to join us today to talk about the acquisition of Countrywide.
* * *
Today's announcement presents a unique opportunity to acquire the mortgage capabilities and scale that are critical to our customer relationships at a time when valuations are, in fact, very compelling.  Our extensive due diligence supports our overall valuation and pricing of the transaction.
* * *
We now move to the top of both originating and servicing, with a 25% share of the origination market and a 17% share of the servicing market.  While we are regarded as one of the most efficient mortgage shops, Countrywide has product expertise and a sales culture that tops our capabilities.  By utilizing their skill sets, we can offer more mortgage capabilities to our vast customer base.
* * *
When we marry the best practices of sales capabilities and efficient operations, we can dramatically improve the profitability of the Company.
* * *
So we view this as a one time opportunity to acquire the best mortgage platform in the business at a time when the value is very attractive.
* * *
Let me tell you just a few things that make Countrywide an important product.  As I said, they are America's largest overall originator of mortgages, with leadership positions across all sales channels and retail, wholesale, and correspondent lending.  With a $1.5 trillion dollar servicing portfolio, they service more than 9 million loans.

They have locations – either loan offices, 700-plus or banking centers, 200-plus – in nearly every state in the U.S.  These offices are focused on the most heavily-

populated United States of California, Florida, and Texas, to name a few, and staffed with 15,000 mortgage sales associates.

These associates are led by a long-tenured management team that has built an incredible company with areas of operational expertise that has weathered many past cycles.  Their balance sheet has more than $200 billion in assets and roughly $55 billion in deposits.

As you are all aware, this year has been tough for them, as their model was severely impacted by market liquidity concerns and the ability to fund asset growth.  These problems play into our strengths as we have the funding with our deposit book and access to the markets to continue to grow the business.

* * *

We expect to close the deal in the third quarter after customary approvals from regulatory bodies as well as Countrywide shareholders.  We have completed due diligence and received both Bank of America's approvals.

Now as Ken said, the due diligence on this deal was extensive.  We had more than sixty people on the ground for the better part of the last thirty days, with more focus picking up through the holidays.  The focus of the due diligence, as you would expect was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas.  The results of our due diligence support our overall valuation and pricing of the transaction.

233.     Defendant Price also spoke at the conference and took questions from analysts:

**RONALD TEMPLE:**  Okay, that helps.  Two other quick ones.  Do you have any protection from legal ramifications?  Obviously, Countrywide has been involved in some litigation thus far, how should we think about that?  I think Ron Mandle kind of referenced that implicitly as well.

**JOE PRICE:** Go back to the comment made earlier.  Again, our being clearly focused on those areas in due diligence both from a kind of corporate as well as particular product aspect, and incorporated that in the economic evaluation in arriving at our pricing or validating our pricing.

* * *

**LORI APPELBAUM, ANALYST, GOLDMAN SACHS:**  My questions were largely asked by Ron and Ron, but I will try again anyway. Joe, you mentioned that much of the due diligence was spent on the MSR credit and legal; and that was a factor in how you set the exchange ratio. If you could provide any key assumptions across those three measures at all in coming to the exchange ratio.

**JOE PRICE:**  No, not really.  Let me clarify, Lori.  What we did is we did our due diligence; and obviously our exchange ratio was established based on market pricing and all the other attributes that you would consider in that.

What I was meaning is that our due diligence findings were supported or fully encompassed in when we set that exchange ratio, so.

But no, I am not prepared to provide any details specific as to specific estimates on particular items. Obviously, that will change up through the date of application of purchase accounting once the deal is approved in early third quarter period.

234.    Defendant Lewis also spoke to analysts at the conference:

**JEFF HARTE, ANALYST, SANDLER O'NEILL:**   Good morning, guys. Most of my questions have been hit.  I have two left.  One, I understand the due diligence process from the credits and what is in the portfolio standpoint.  Can you talk a little bit more about how you got comfort on the litigation and potential regulatory site?  Because we are looking at one of the biggest subprime issuers out that. With subprime having a lot of problems, and government kind of entities looking into it, and lawsuits potentially looming, how do you get comfortable with your potential exposures on those two fronts?

**KEN LEWIS:**         Well, all I can say is we had a lot of advice from both our internal group and also from two other entities that put some parameters around it.

235.    Despite these repeated specific questions on potential legal issues facing Countrywide, Defendants Price and Lewis refused to inform investors about the state investigations surrounding Countrywide's predatory lending practices.

236.    On April 29, 2008, Countrywide reported a shocking first quarter loss of $893 million, reflecting $3 billion in credit-related charges.  Countrywide wrote off $1.5 billion in losses on its residential loan portfolio alone, ten times the amount written off the previous year. The news led to Standard & Poor's decision to downgrade Countrywide debt to junk-bond status. Countrywide shares dropped a precipitous 10 percent in one day.

       **2.**      **The Merrill Lynch Merger**

       **a)**      **The Merger Agreement Is Filed On September 18, 2008**

237.    On September 18, 2008, three days after Defendants announced the proposed merger, BoA and Merrill filed a Form 8-K with the SEC attaching the Merger Agreement. The Merger Agreement assured BoA shareholders and investors that Merrill <u>would not pay</u>

discretionary bonuses before the merger closed.  Specifically, in a section titled "Company

Forbearances," the Merger Agreement provided that, "except as set forth in Section 5.2 of the

Company Disclosure Schedule or except as expressly contemplated or permitted by this

Agreement," from September 15, 2008 through January 1, 2009, Merrill "shall not, and shall not

permit any of its Subsidiaries to, without the prior written consent of [BoA]," undertake any of

18 enumerated actions, including:

> increase in any manner the compensation or benefits of any of the current
> or former directors, officers or employees of Company or its Subsidiaries
> (collectively, 'Employees'), [or] pay any amounts to Employees not
> required by any current plan or agreement (other than base salary in the
> ordinary course of business).

238.   This statement was materially misleading. First, the statement set forth above

represented that Merrill was prohibited from paying discretionary year-end bonuses before the

time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to

$5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before

the merger closed. Second, the statement set forth above falsely reassured investors that BoA had

not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA

had already granted its consent with respect to the payment of $5.8 billion of bonuses. As set

forth above, the undisclosed bonus agreement was highly material because, among other reasons,

(i) the amount set aside to pay bonuses constituted 12% of the entire merger price and 30% of

Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal

bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses

despite the fact that it lost more than $21 billion in the fourth quarter; and (iv) the payment of

these bonuses before the merger closed ensured that BoA shareholders would receive an asset

worth billions of dollars less than contemplated.

239.    The agreement allowing Merrill to pay $5.8 billion of bonuses pursuant to Merrill's VICP before the merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule." While the Merger Agreement made a generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders. Defendants' failure to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because they violated Item 601(b)(2) of Regulation S-K.  Item 601(b)(2) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement." In addition, Item 601(b)(2) further provides that any plan of acquisition "shall contain a list briefly identifying the contents of all omitted schedules, together with an agreement to furnish supplementally a copy of any omitted schedule to the Commission upon request." Accordingly, Defendants' failure to publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement also rendered the September 18, 2008 Forms 8K materially false and misleading.

### b)    The Secondary Offering Documents

240.    On October 6, 2008, BoA announced that it was conducting the Secondary Offering for approximately $10 billion.

241.    The Secondary Offering was conducted pursuant to BoA's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

242.    The Offering Documents expressly incorporated by reference BoA's Form 8-K filed with the SEC on September 18, 2008. As set forth above at ¶¶218-220, the September 18

Form 8-K contained untrue statements of material facts and omitted to state material facts, thereby rendering the Offering Documents materially false and misleading.

### c)       The Proxy

243.    On October 2, 2008, BoA filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed two amendments on Forms S-4/A on October 22 and October 29, 2008. On November 3, 2008, BoA and Merrill filed the definitive Proxy, including the attached Merger Agreement, with the SEC on Form DEFM14A and as a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3), and mailed it to shareholders.

244.    The Proxy, which included a cover letter signed by Defendants Lewis and Thain, explained the terms and conditions of the merger to shareholders, informed them about the background of the merger, and set forth the reasons why the BoA and Merrill Boards recommended that shareholders vote in favor of the merger.  The Proxy also informed BoA and Merrill shareholders that the shareholder vote on the merger would occur on December 5, 2008.

245.    The Proxy was materially false and misleading at the time it was filed because it failed to disclose any information whatsoever about Merrill's October 2008 losses. At the time the Proxy was filed on November 3, 2008, Merrill had sustained more than $7.5 billion in losses in October alone – a highly material amount which Defendants were required to disclose.

246.    Moreover, as Merrill's losses increased, Defendants were under a duty to update the Proxy to correct any of the false and misleading statements or omissions they had previously made, and to update any statements or omissions that had become false or misleading as a result of intervening events. Defendants also were required to disclose Merrill's losses of October and November 2008 under Section 14(a) of the Exchange Act, because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts to allow a reasonably prudent investor to make an informed investment decision. Defendants also had a duty to correct

and/or update under Rule 14a-9, which required Defendants to update in proxy supplements "any statement in any earlier communication with respect to the solicitation of a proxy . . . which has become materially false or misleading."

247.    As set forth more fully above, by mid-November 2008, Merrill's losses had increased to at least $9 billion and were rapidly accelerating. By the end of November, Merrill had suffered additional losses of more than $4 billion as well as a goodwill impairment of $2.2 billion.  Thus, by the beginning of December 2008 – just days before the shareholder vote on the merger – Merrill had already suffered a staggering $15.5 billion in total losses and impairments in October and November 2008, with billions of dollars of additional losses projected for December.

248.    In violation of their duty to disclose all material facts to allow BoA shareholders to make an informed decision in connection with the merger, and their duty to update and/or correct the Proxy as a result of intervening events, Defendants never disclosed Merrill's massive losses at any time before the shareholder vote.  These losses were highly material.  Specifically, Merrill's $15.5 billion pretax loss for October and November 2008 substantially exceeded Merrill's pretax loss from continuing operations of $12.8 billion for all of 2007 – the worst year in its history. In fact, these losses were so material that, beginning in late November – weeks before the vote – BoA executives debated internally about terminating the merger by invoking the MAC. The failure to disclose the losses Merrill suffered in October and November 2008 prior to the shareholder vote rendered the Proxy materially false and misleading.

249.    The Proxy was also materially false and misleading because it failed to disclose that BoA had agreed to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed.  As noted above, this secret bonus agreement was highly material.  Indeed, as Merrill's

losses increased to $15.5 billion before the shareholder vote, the undisclosed bonus agreement became even more material because it permitted the payment of billions of dollars in bonuses to Merrill's executives and employees despite the fact that Merrill's losses, and their impact on BoA, were catastrophic.

250.    In fact, rather than disclose this secret agreement, the Proxy falsely represented to investors that, as part of the merger, Merrill "will not" pay any discretionary bonuses. Specifically, the Proxy stated that, subject to "certain exceptions" which were unspecified, or unless it had BoA's "prior written consent," Merrill "will not . . . undertake the following [18] extraordinary actions," including:

> (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements; (iii) become a party to, establish, adjust, or terminate any employee benefit or compensation plan or agreement. . . .

251.    The Proxy further stated that BoA's "written consent" "will not be unreasonably withheld or delayed," falsely indicating that no such consent had been given.

252.    Similarly, the Merger Agreement attached to the Proxy assured investors that Merrill "shall not" make any discretionary bonus payments in language identical to that set forth in the agreement attached to the September 18, 2008 Form 8-K, reproduced above.

253.    The statements in the Proxy and the Merger Agreement were materially false and misleading for the reasons set forth above.

254.    In addition, the Proxy incorporated Merrill's March 2008 Proxy, which made other false statements about the bonus awards, including that (i) Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year"; (ii) "[t]he goal of our compensation programs is to provide an integral link

between pay and performance and to fully align the interests of employees with those of shareholders"; (iii) Merrill's bonus policy "provide[s] a strong incentive to increase financial performance and enhance returns to shareholders"; (iv) Merrill's "pay for performance" policy "fosters an ownership culture that increases executive focus on Company-wide returns across economic and business cycles"; and (v) Merrill's "pay for performance" policy focused on "the performance of the Company as a whole," and was emphasized as "the core of our compensation policy."

255.    The statements set forth above were false.  Directly contrary to the statement that Merrill paid bonuses "in January for performance in the prior fiscal year," Merrill, BoA, Thain, and Lewis had already agreed to allow Merrill to pay up to $5.8 billion of bonuses in December, before the merger closed.  Moreover, directly contrary to the statements that Merrill's bonus practice and policy was to "pay for performance" in order to "enhance returns to shareholders," the secret bonus agreement, including the accelerated schedule, allowed Merrill to pay billions of dollars in bonuses regardless of Merrill's massive fourth quarter and year-end losses and their effect on shareholders.

### d)    The Proxy Supplements

256.    As noted above, Defendants were under a continuing duty to update and correct the Proxy to disclose the material adverse facts set forth above, including the secret bonus agreement and Merrill's massive losses.  On November 21, 2008, BoA and Merrill filed a Proxy Supplement without disclosing any of these facts, and without correcting or updating any of their prior false and misleading statements.  Similarly, on November 26, 2008, as BoA executives were debating invoking the MAC, BoA filed another Proxy Supplement, attaching a letter from Lewis, which also failed to disclose any of these facts and did not correct or update any of BoA's or Lewis's false and misleading statements. By failing to do so, these Proxy Supplements falsely

affirmed that nothing in BoA's earlier proxy solicitations was, or had become, materially false or misleading.

### e) Defendants' Failure To Disclose Highly Material Information Prior To The Close Of The Merger

257. As alleged above, following the December 5, 2008 shareholder vote and prior to the close of the merger on January 1, 2009, Lewis and Price determined – and informed Secretary Paulson and Chairman Bernanke – that Merrill's losses were so large that BoA could not absorb them, and that, as a result, BoA had determined to terminate the merger by invoking the MAC. Ultimately, rather than invoking the MAC, BoA requested and received a highly dilutive $138 billion taxpayer bailout in order to enable BoA to absorb Merrill's losses. BoA, Lewis, and Price failed to disclose this highly material fact before the merger closed.

258. In addition, on December 31, as Merrill's losses for the fourth quarter reached $21.5 billion, Merrill paid out the cash component of the $3.6 billion in bonuses, with BoA's knowledge and approval – a highly material fact that was also not disclosed before the merger closed.

### D. The Securities Fraud Action

259. Pending in the Southern District of New York is the Multi-District Litigation entitled In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, 09-MDL-2058 (the "MDL"). The cases pending in the MDL are concerned, for the most part, with the BoA/Merrill Lynch merger.

260. On August 27, 2010, the MDL Court granted in part and denied in part the Defendants Motion to Dismiss the Securities Class Action complaint alleging defendants Lewis, Price, Barnet, Bramble, Collins, Countryman, Gifford, Lozano, Massey, May, and Ryan violated

federal securities laws. The same Order also granted in part and denied in part the Defendants Motion to Dismiss the shareholder derivative action brought for breaches of fiduciary duty. The shareholder derivative defendants include Defendants Lewis, Price, Cotty, Gifford, Barnet, Bramble, Collins, Countryman, Lozano, Massey, May, and Ryan.

261.   The Securities Class Action alleged Section Section 10(b) and Rule 10b-5 claims against Lewis, Thain, and BofA for alleged misstatements related to the bonus arrangement described above, and against Lewis and BofA for alleged omissions related to the bonus arrangement. The Securities Complaint states claims under Section 14(a) and Rule 14a-9 against Lewis, Thain, BofA, and the BofA directors as to the bonus arrangement, and also claims under Section 14(a) and Rule 14a-9 arising out of their failure to disclose Merrill's fourth quarter 2008 losses. These claims survived the Motion to Dismiss and remain pending in the MDL. In addition, the claims for control person liability pursuant to Section 20(a) of the '34 Act survived. Finally, the Securities Complaint's claims under the '33 Act based on the alleged misstatements and omissions concerning Merrill's bonus payments survived the Motion to Dismiss.

262.   The Derivative Complaint alleges Section 14(a) and Rule 14a-9 claims against the BofA Directors for misstatements and omissions related to the bonus arrangement and for failing to disclose Merrill's fourth quarter 2008 losses. These claims survived the Motion to Dismiss. The BofA Directors did not moved to dismiss the breach of fiduciary duty claims arising from their actions or omissions after they approved BofA's acquisition of Merrill.

### E.   Whistleblower Actions

263.   In addition to the above, BoA is having to contend with numerous whistleblower lawsuits relating to alleged improper conduct by themselves or by Countrywide.

264.     On January 17, 2008, a whistleblower filed an action in the Southern District of Texas, *Zachary v. Countrywide Financial Corp, et al*., Case No. 08-cv-214. In Zachary, the whistleblower alleges numerous questionable lending practices committed by Countrywide, including inflating home appraisals, flipping loans, and coaching borrowers to overstate their income to qualify for a loan. According to an NBC article, Countrywide whistleblower reports 'liar loans', dated June 1, 2008, other former Countrywide employees in different parts of the country corroborated these claims.

265.     On May 13, 2009, a whistleblower action was filed in the Eastern District of New York, *U.S. ex rel. Lagow v. Countrywide Financial Corp, et al*., Case No. 09-cv-2040. This action was brought to recover damages under the False Claims Act arising from a fraud on the U.S. Department of Housing and Urban Development. The suit alleges that Countrywide and the other defendants caused false, inflated appraisals to be submitted in connection with applications for Federal Housing Administration mortgage insurance loans.

266.     On July 7, 2011, a whistleblower action was filed in the Eastern District of New York, *U.S. ex rel. Mackler v. Bank of America, N.A., et al*., Case No. 11-cv-3270. This action was brought to recover damages under the False Claims Act arising from false and fraudulent records, materially false statements, and fraudulent claims made by BoA to the United States Government under the Home Affordable Modification Program ("HAMP"). The suit alleges that BoA deliberately denied the scores of homeowners who qualified for HAMP modifications and lied to these homeowners about their qualifications. The purpose was to prevent homeowners from receiving HAMP modifications, because these modification would negatively impact BoA's bottom line. Without the HAMP modification, homeowners would lose their homes to foreclosure, or be forced into more costly modifications outside of HAMP. BoA received $45

million from the federal government pursuant to the Troubled Asset Relief Program. According to a Reuters article, "Whistleblower says BoA defrauded HAMP" dated March 7, 2012, BoA would pretend to lose homeowners' documents, would fail to credit payments, and mislead homeowners about their eligibility, while still letting just enough homeowners qualify for HAMP modification to allay suspicion.

267.    On September 14, 2011, the Huffington Post reported that BoA had been ordered to pay a whistleblower $930,000. The employee was based in the Los Angeles area and had led internal investigations that revealed widespread and pervasive wire, mail and bank fraud involving Countrywide employees.

268.    On February 10, 2012, the U.S Attorneys Office for the Eastern District of New York announced a $1 billion settlement with BoA for claims against it and Countrywide for origination and underwriting mortgage fraud related to their lending practices.

269.    The whistleblower actions described above indicate that BoA was involved in fraudulent activities of its own; however, many of the activities that BoA is now trying to defend occurred at Countrywide. If BoA had done a proper due diligence of its purchase of Countrywide, it would have uncovered this pervasive fraudulent activity and either backed out of the deal, or purchased Countrywide at a much lower price.

### F.    State Regulatory Actions

270.    As described above, BoA is responsible for the numerous suits filed against Countrywide by various state Attorneys General for fraudulent mortgage practices.

271.    On June 25, 2008, Illinois Attorney General, Lisa Madigan, filed a lawsuit against Countrywide alleging the company had engaged in unfair and deceptive practices in an effort to induce homeowners to apply for risky mortgages beyond their means. California Attorney

General, Jerry Brown, filed a similar lawsuit on the same date alleging Countrywide had broken the state's false advertising and unfair business practices laws. On July 1, 2008, Florida Attorney General Bill McCollum filed a lawsuit against Countrywide making similar allegations.

272. On August 6, 2008, Connecticut State Attorney General, Richard Blumenthal ("Blumenthal"), filed suit against Countrywide seeking to recover damages for violations of state consumer protection and banking laws. Blumenthal stated in relevant part:

> ***Countrywide conned customers into loans that were clearly unaffordable and unsustainable, turning the American Dream of homeownership into a nightmare.*** When consumers defaulted, the company bullied them into workouts doomed to fail. Countrywide crammed unconscionable legal fees into renegotiated loans, digging consumers deeper into debt. ***The company broke promises that homeowners could refinance, condemning them to hopelessly unaffordable loans.***

> Countrywide was at their side -- as an insolvency enabler. Countrywide inflated homeowner incomes to qualify them for loans they couldn't pay back and misled consumers about loan terms.

> Countrywide stacked the deck and the deal against its customers: Our goal is to un-stack the deck -- and undo the deals -- restoring fairness and fiscal sense to mortgages. I will fight for restitution -- money back to homeowners used and abused by Countrywide -- as well as fines and forfeitures to the state. Our lawsuit seeks to invalidate loans that violate state law, allowing consumers to shed illegal, unreasonable fees and conditions that leave them at the precipice of foreclosure. We must vigorously fight predatory lending practices that trap consumers on a debt treadmill.

On August 12, 2008, West Virginia Attorney General Darrell McGraw brought similar claims against Countrywide. On August 24, 2008, Indiana Attorney General Steve Carter filed a similar lawsuit, making it the sixth state to file suit against Countrywide.

### G.     Federal Investigations of Defendants

273. Various federal agencies have also conducted investigations of BoA, either related to its own action, or to actions involving Countrywide or Merrill Lynch.

274.   The investigations by the SEC have been described in detail above, but they include charges initiated on August 3, 2009 against BoA for failing to disclose Merrill Lynch bonus payments.

275.   Additionally, on June 3, 2009, the SEC announced that it had filed complaints against BoA and other companies, alleging that BoA misled investors regarding liquidity risks associated with auction rate securities ("ARS") that they underwrote, marketed, or sold. BoA misrepresented to certain customers that ARS were safe, highly liquid investments that were comparable to money markets. However, in late 2007 and early 2008, BoA knew that the ARS market was deteriorating, but failed to make its customers aware of the risks. BoA decided to stop supporting the ARS market, leaving customers holding illiquid ARS. BoA and the other firms entered into a $6.7 billion settlement with the SEC for these complaints.

### H.   Federal Bureau of Investigation

276.   On October 19, 2012, the *Associated Press* reported that the Federal Bureau of Investigation is reportedly looking into whether there was any criminal misconduct in BoA's foreclosure documentation problems. The purpose of the investigation is whether BoA acted with any criminal intent when it resorted to "robo-signing," where employees are speeding documents along without actually reading them.

### I.   Department of Justice

277.   The U.S. Department of Justice conducted an investigation of Countrywide's lending practices and filed a complaint alleging that, from 2004 to 2008, Countrywide engaged in a nationwide pattern or practice of discrimination based on race or national origin. The complaint alleges that between 2004 and 2008, Countrywide's business practice allowed its employees and mortgage brokers to vary a loan's interest rate and other fees from the price it set

based on a borrower's objective credit-related factors. Countrywide charged more than 200,000 Hispanic and African-American borrowers higher fees and costs for their loans than non-Hispanic White borrowers, not based on borrower risk but because of their race or national origin. Both prime and subprime borrowers were charged more for loans.

278.    The complaint also alleges that between 2004 and 2007, Countrywide's business practice allowed its mortgage brokers and employees to place a loan applicant in a subprime loan even when the applicant qualified for a prime loan according to Countrywide's underwriting practices. As a result of these policies and practices, the odds of an African-American or Hispanic borrower receiving a subprime loan instead of a prime loan were more than twice as high as those for similarly-situated non-Hispanic White borrowers.

279.    The complaint also alleges that between 2004 and 2008, Countrywide violated the Equal Credit Opportunity Act by requiring spouses who were not applicants on a loan to sign away their rights to their home.

280.    On December 21, 2001, the Department of Justice announced that BoA had entered into a consent agreement whereby it would pay $335 million to settle these claims based on Countrywide's practices.

### J.      New York Attorney General

281.    The investigation by the New York State Attorney General's Office has been described in detail above. The investigation was announced on January 27, 2009, and was conducted to investigate into $3.6 billion in end of the year bonuses paid by Merrill Lynch to its executives.

### K.      U.S. House of Representatives' Committee on Oversight and Government Reform

282.    The U.S. House of Representatives' Committee on Government Reform and Oversight has held three hearings on the BoA/Merrill Lynch merger. The Committee opened an investigation into the events surrounding merger and the role the federal government played in the transaction.

### L.    Conspiracies with Financial Advisers to Municipalities

283.    BoA has been accused of engaging in a conspiracy in which financial advisers to municipalities, such as CDR Financial Products, Inc. ("CDR") colluded with Bank of America to rig bids on auctions for guaranteed investment contracts.

284.    In its July 2010 issue, the well-respected financial magazine *Bloomberg Markets* published an article entitled "Rigging the Market" which described in great detail a scheme by which banks, including Bank of America, paid kickbacks to CDR in order to receive information to allow it to win bids at lower interest rates.  Further, it appears that Bank of America colluded with Investment Management Advisory Group, Inc. to insure that it would win bids through a process of soliciting sham bid from other banks. Numerous lawsuits have been filed because of this scheme, and the Securities and Exchange Commission is conducting a probe of this activity.

### M.    Damages to BoA as a Result of Catastrophic Countrywide and Merrill Mergers

285.    As a direct and proximate result of the Individual Defendants' actions, the Company has expended, and will continue to expend, significant sums of money Company to cover its $8.7 billion in losses related to litigation for predatory lending.

286.    The Individual Defendants' actions have irreparably damaged BoA's corporate image and goodwill. For at least the foreseeable future, BoA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

improper behavior and have misled the investing public, such that BoA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

287.     BoA has suffered a significant loss in its market capitalization.  The Company faces massive liability exposure as a result of the numerous state and federal investigations, whistleblower complaints and securities fraud class action suits that were filed against the Company and certain members of its management brought by investors, whistleblowers and numerous state and federal agencies.

288.     BoA has suffered costs relating to the Company's internal investigation of its suspension of its foreclosure sales to conduct an assessment of the Company's foreclosure processes.

289.     BoA has further suffered damages in the form of costs related to any remedial steps the Company is forced to pursue in response to the numerous state and federal investigations detailed above.

290.     BoA has suffered damages to the Company's reputation which could significantly harm the Company.  BoA admits in its SEC filings that its reputation and the "public perception" of the Company has declined as a result of the increased regulatory scrutiny the Company has faced and will continue to face resulting from irregularities in servicing, foreclosure, consumer collections, mortgage loan modifications and other practices, lending volumes, compensation practices, and the Company's acquisitions of Countrywide and Merrill Lynch.

291.     The Company has suffered and will continue to suffer damages as a result of the litigation and regulatory matters and any related settlements as the Company's cash flow, financial condition and results of operations will likely be negatively affected.

**N.      Bank of America Pays Severance Packages to Defendants Thain and Lewis**

292.    Bank of America also paid questionable severance packages to Defendants Thain and Lewis. Thain was terminated for cause and yet still retained a generous severance package. Lewis was permitted to resign, despite substantial evidence that he should have been terminated for cause, thus making him eligible for a severance package.

293.    On January 22, 2009, Defendant Thain, was fired from BoA after it was uncovered that he rushed billions in bonuses to Merrill Lynch employees despite the huge losses the brokerage firm suffered and while asking for a bailout from the federal government. Despite this, he was sill permitted to take home a $1.5 million severance package.

294.    Defendant Lewis resigned from his positions on December 31, 2009. Lewis headed the disastrous Countrywide and Merrill mergers as described above. Instead of being terminated, Lewis was permitted to resign and received a $72 million severance package of stock and other compensation and $53 million in pension money.

**O.      Non-Applicability of BoA's Exculpatory Provision**

295.    Under Delaware Law, a Delaware corporation may adopt a provision in its articles of incorporation exempting its directors from liability for violations of the duty of due care. Del Code Ann. Tit. 8, § 102(b)(7) ("102(b)(7)"). However, this Complaint adequately alleges several reasons why the Court should allow this action this action to go forward: The protection of an exculpatory certificate of incorporation provision is an affirmative defense, which is not suitable for the pleading stage, and a defendant seeking exculpation bears the burden of establishing its elements. Here, Defendants breached their fiduciary duties of loyalty and good faith, were unjustly enriched and are liable for gross mismanagement and abuse of control.

296.    No discovery has taken place. Hence, this Action should be allowed to proceed; Even assuming, arguendo that 102(b)(7) applies at the pleading stage, 102(b)(7) does not extend

to acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law. Simply put, 102(b)(7) does not enable a corporation to eliminate directors' liability for monetary damages for all non-intentional breaches of their fiduciary duties. Rather, pursuant to 102(b)(7), a corporation may adopt a provision eliminating directors' monetary liability for breaches of the duty of care, but not for any breach of the director's duty of loyalty nor for acts or omissions not in good faith, whether they be "intentional" or "non-intentional."

297.   Here, Defendants reached their duties of loyalty and good faith. Specifically, Defendants violated the duty of loyalty by, inter alia, engaging in and permitting the insider transactions complained of herein. Because the Complaint alleges conduct by Defendants in addition to duty of care allegations, Defendants' conduct falls within the definition of directorial failure to act in good faith under applicable Delaware law, constituting a breach of the non-exculpable, non-indemnifiable duty of loyalty; and Section 102(b)(7) by its express terms applies only to directors. Thus, the Defendants who served as both officers and directors of the Company would only be protected to the extent they acted solely as a director.

## VI.   DERIVATIVE AND DEMAND ALLEGATIONS

298.   Plaintiff brings this action derivatively in the right and for the benefit of BoA to redress the breaches of fiduciary duty and other violations of law by Individual Defendants.

299.   Plaintiff will adequately and fairly represent the interests of BoA and its shareholders in enforcing and prosecuting their rights.

300.   On July 18, 2011, Plaintiff served BoA with a written demand demanding, that the Board of Directors of BoA (the "Board") establish an Independent Committee to take action to fully investigate and recover damages in connection with, *inter alia*, the due diligence regarding the Countrywide merger, the indemnification of Countrywide officers, Merrill Lynch

bonuses, municipal derivatives, mortgage foreclosure problems and recent settlements the Company entered into (the "Demand").  *See* Exhibit 1, attached hereto.

301.    On October 19, 2011, the Company's General Counsel, on behalf of the Company, sent to Plaintiff its purported response to Plaintiff's Demand advising that the Board had authorized the Audit Committee to consider the Demand and that a further response would be provided to Plaintiff in "due course".  *See* Exhibit 2, attached hereto.

302.    On January 19, 2012, the Company's Associate General Counsel, on behalf of the Company, sent to Plaintiff its purported response to Plaintiff's Demand advising that the Audit Committee and the Board had considered the Demand and determined that it was not in the best interests of BoA to take an action to pursue Plaintiff's claims.  *See* Exhibit 3, attached hereto

303.    Since January 19, 2012, Plaintiff has received no further response to his Demand.

304.    At the time that the initial demand was made on July 18, 2011, the Board consisted of the following thirteen (13) directors: Defendants Ambani, Bies, Bramble, Colbert, Gifford, Jones, Holliday, Lozano, May, Moynihan, Powell, Rossotti and Scully. The members of the Audit Committee were Defendants Bies, Jones, Powell, Rossotti (Chair), and Scully.  None of these individuals were disinterested and independent with respect to considering Plaintiff's demand letters.

## VII.    CAUSES OF ACTION

### COUNT I
### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR DISSEMINATING FALSE AND MISLEADING STATEMENTS

305.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

306.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that BoA disseminated accurate, truthful and complete information to its shareholders.

307.    Individual Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to BoA shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

308.    As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF**
**FIDUCIARY DUTIES FOR FAILING TO MAINTAIN ADEQUATE**
**INTERNAL CONTROLS**

309.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

310.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's statements were accurate and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

311.    Individual Defendants willfully ignored the obvious and pervasive problems with BoA's reporting practices, procedures, and internal controls, and failed to make a good faith effort to correct these problems or prevent their recurrence.

312.    As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

313.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

314.    By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of BoA.

315.    Plaintiff, as a shareholder and representative of BoA, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
## AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

316.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

317.    Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BoA, for which they are legally responsible.  In particular, Individual Defendants abused their positions of authority by causing or allowing BoA to misrepresent material facts.

318.    As a direct and proximate result of Individual Defendants' abuse of control, BoA has sustained significant damages.

319.    As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

320.    Plaintiff, on behalf of BoA, has no adequate remedy at law.

## COUNT V
## AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

100

321.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

322.   Individual Defendants had a duty to BoA and its shareholders to prudently supervise, manage and control the operations, business and disclosure controls of BoA.

323.   Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of BoA in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Individual Defendants breached their duties of due care, diligence and candor in the management and administration of BoA's affairs and in the use and preservation of BoA's assets.

324.   During the course of the discharge of their duties, Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Individual Defendants caused BoA to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to BoA, thus breaching their duties to the Company. As a result, Individual Defendants grossly mismanaged BoA.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Declaring that the directors of the Company have violated and/or aided and abetted in the breach of their fiduciary duties to the Company and its shareholders;

C.   Removing and replacing the Company's directors, instituting a new election of directors and appointing a receiver for the management of the Company until a new election of directors is called and determined;

D.   Ordering   appropriate   equitable   relief   to   remedy   Individual   Defendants'

misconduct;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all claims on which a jury trial is available.

DATED:  June 8, 2012                          Respectfully submitted,

                                              _____

                                              Marc S. Henzel
                                              Law Offices of Marc Henzel
                                              431 Montgomery Ave., Suite B
                                              Merion, PA 19066
                                              Telephone: (610) 660-8000
                                              Facsimile: (610) 660-8080
                                              mhenzel@henzellaw.com

                                              Attorneys for Plaintiff

                                              Attorneys for Plaintiff

I:\BankofAmerica\Derivative\Pleadings\Complaint.docx